OPINION OF THE COURT
Simons, J.
This appeal addresses the sufficiency of the complaint and the affirmative defenses contained in the pleadings in an action by an insured against its insurer who disclaimed coverage under a commercial crime insurance policy. The two principal issues are (1) whether the complaint states a cause of action for punitive damages under the standards set forth in Rocanova v Equitable Life Assur. Socy. (83 NY2d 603) and (2) whether plaintiff has stated a cause of action under General Business Law § 349.
I
In April 1990, plaintiff New York University (NYU) discovered a substantial shortage of merchandise in the clothing department of one of the university book stores. Its internal investigation led it to determine that Dwight Johnson, the book store’s general merchandise buyer, had falsified order forms, invoices, and shipping and receiving documents for *314 imprinted apparel purchased from MHK, Inc., a clothing vendor. Plaintiff concluded that Johnson and MHK had acted together in a scheme to bill NYU for merchandise never received and calculated that Johnson’s actions had cost the university more than $1.6 million.
In September of 1988, NYU had purchased a commercial crime liability insurance policy from defendant Continental Insurance which included an endorsement for losses resulting from "Employee Dishonesty.” The endorsement, which was in effect when NYU discovered Johnson’s defalcations, provided coverage of $10 million. Through its insurance agent, Johnson & Higgins, NYU submitted a claim to defendant Continental Guaranty & Credit Corp., the claims servicing agent for defendant Continental Insurance.
Defendants conducted an investigation of plaintiff’s claim, including review of the documentation submitted by plaintiff and interviews with NYU’s bookstore employees, Dwight Johnson, Michael Kaye (the principal of MHK), and, in addition, consulted with an FBI agent who was investigating possible criminal charges. Johnson and Kaye denied any wrongdoing. Kaye maintained that merchandise had been purchased under a "bill and hold” arrangement and that some $200,000 worth of merchandise was being stored for plaintiff in a Brooklyn warehouse. Defendants subsequently denied the claim advising plaintiff that Johnson and Kaye appeared truthful and that the claim was not supported by the documentation submitted.
Thereafter, Continental informed plaintiff that its open-ended policy would expire on its anniversary date, and would not be renewed for "underwriting reasons.” Continental offered a successor policy that, according to plaintiff, included onerous terms unacceptable to the university.
In April 1992, plaintiff commenced this action. In its amended complaint, it made comprehensive factual allegations about Johnson’s defalcation, defendants’ "sham” investigation and denial of plaintiff’s claim, the "vindictive” nonrenewal of the policy following plaintiff’s submission of the claim and referred to numerous instances of Continental Insurance Company’s bad-faith practices with respect to policyholders nationwide. Plaintiff alleged that defendants’ conduct violated their obligations to deal with plaintiff fairly and in good faith, and were contrary to New York statutory provisions proscribing deceptive business acts and unfair claim settlement practices by insurance companies.
*315 The amended complaint set forth five causes of action. The first sounded in breach of contract and demanded indemnification for the amount of the claim minus the deductible. The second asserted that defendants breached their obligations to act in good faith toward and deal fairly with plaintiff and demanded the same relief. The third cause of action alleged deceptive business practices in violation of General Business Law § 349, and demanded treble damages to the statutory cap of $1,000. The fourth and fifth causes of action alleged unlawful and fraudulent conduct, respectively, in support of plaintiff’s demand for contract damages plus punitive damages in the amount of $10 million. The complaint also included a demand for attorneys’ fees and other costs on each of the causes of action.
In their answer, defendants’ first affirmative defense asserted that all causes of action except the first failed to state a cause of action. Their second affirmative defense invoked a policy exclusion for claims arising from "inventory computation.”
Conceding the viability of the first cause of action for breach of contract, defendants moved pursuant to CPLR 3211 (a) (7) to dismiss the remaining causes of action and the demand for attorneys’ fees. Plaintiff cross-moved to dismiss the affirmative defenses. Supreme Court denied defendants’ motion in its entirety, and granted plaintiff’s cross motion and dismissed the affirmative defenses. The Appellate Division affirmed, granted defendants leave to appeal to this Court, and certified the following question: "Was the order of the Supreme Court, as affirmed by this Court, properly made?” For the reasons that follow, we conclude that it was not.
II
We first consider whether plaintiff’s amended complaint supports its demand for punitive damages.
In Rocanova v Equitable Life Assur. Socy. (83 NY2d 603, supra), we reiterated the principle that damages arising from the breach of a contract will ordinarily be limited to the contract damages necessary to redress the private wrong, but that punitive damages may be recoverable if necessary to vindicate a public right (id., at 613; see also, Garrity v Lyle Stuart, Inc., 40 NY2d 354, 358). Punitive damages are available only in those limited circumstances where it is necessary to deter defendant and others like it from engaging in conduct that may be characterized as "gross” and "morally reprehensible,” *316 and of " 'such wanton dishonesty as to imply a criminal indifference to civil obligations’ ” (Rocanova, 83 NY2d, at 614, supra, quoting, Walker v Sheldon, 10 NY2d 401). We set forth in the decision the pleading elements required to state a claim for punitive damages as an additional and exemplary remedy when the claim arises from a breach of contract. They are: (1) defendant’s conduct must be actionable as an independent tort; (2) the tortious conduct must be of the egregious nature set forth in Walker v Sheldon (10 NY2d 401, 404-405, supra); (3) the egregious conduct must be directed to plaintiff; and (4) it must be part of a pattern directed at the public generally (Rocanova, 83 NY2d, at 613, supra). Where a lawsuit has its genesis in the contractual relationship between the parties, the threshold task for a court considering defendant’s motion to dismiss a cause of action for punitive damages is to identify a tort independent of the contract.
A tort obligation is a duty imposed by law to avoid causing injury to others. It is "apart from and independent of promises made and therefore apart from the manifested intention of the parties” to a contract (Prosser and Keeton, Torts § 92, at 655 [5th edj). Thus, defendant may be liable in tort when it has breached a duty of reasonable care distinct from its contractual obligations, or when it has engaged in tortious conduct separate and apart from its failure to fulfill its contractual obligations. The very nature of a contractual obligation, and the public interest in seeing it performed with reasonable care, may give rise to a duty of reasonable care in performance of the contract obligations, and the breach of that independent duty will give rise to a tort claim (see, Sommer v Federal Signal Corp., 79 NY2d 540). Where a party has fraudulently induced the plaintiff to enter into a contract, it may be liable in tort (see, Channel Master Corp. v Aluminium Ltd. Sales, 4 NY2d 403, 406-407; see also, Deerfield Communications Corp. v Chesebrough-Ponds, Inc., 68 NY2d 954), or where a party engages in conduct outside the contract but intended to defeat the contract, its extraneous conduct may support an independent tort claim (see, North Shore Bottling Co. v Schmidt & Sons, 22 NY2d 171, 179; Rich v New York Cent. & Hudson Riv. R. R. Co., 87 NY 382). Conversely, where a party is merely seeking to enforce its bargain, a tort claim will not lie (see, Sommer v Federal Signal Corp., 79 NY2d, at 552, supra; Bellevue S. Assocs. v HRH Constr. Corp., 78 NY2d 282, 293-295).
Plaintiff contends that its amended complaint states a cause of action in tort because it alleges "that Continental fraudu *317 lently induced the University (and others) to purchase insurance, and to maintain such insurance, by falsely representing that it would evaluate claims in good faith and in compliance with applicable law and by concealing that it is and has long been engaged in a scheme and practice of refusing to indemnify its policyholders and then vindictively and improperly terminating their insurance coverage.” The amended complaint further alleges that defendants acted "recklessly.”
A
Plaintiffs fourth cause of action alleges "unlawful” conduct generally, relating it to defendants’ violations of Insurance Law § 2601 and contending that the conduct gives rise to an independent tort. It relies on Sommer v Federal Signal Corp. (79 NY2d 540, supra).
In Sommer, we held that a fire alarm company owed its customer a duty of reasonable care independent of its contractual obligations, and that notwithstanding a contractual provision exculpating the alarm company from damages flowing from its negligence, it could be held liable in tort for its gross failure to properly perform its contractual services. The alarm company’s duty, separate and apart from its contract obligations, arose from the very nature of its services — to protect people and property from physical harm (see, Prosser and Keeton, op. cit., § 92, at 656-657). Noting the catastrophic consequences that could flow from defendant’s failure to perform its contractual obligations with due care, we cited the municipality’s fire-safety regulations as reflecting the public interest in the careful performance of the fire alarm services contract. We did not, however, suggest that statutory provisions necessarily or generally impose tort duties independent of contractual obligations.
To be sure, the provisions of the Insurance Law reflect State policy that insurers must deal fairly with their insureds and the public at large. But governing the conduct of insurers and protecting the fiscal interests of insureds is simply not in the same league as the protection of the personal safety of citizens. As compared to the fire-safety regulations cited in Sommer, the provisions of the Insurance Law are properly viewed as measures regulating the insurer’s performance of its contractual obligations, as an adjunct to the contract, not as a legislative imposition of a separate duty of reasonable care (see, Insurance Law § 2601 [c]; § 109 [b]). We recognized this in Rocanova when we held that Insurance Law § 2601 does not *318 give rise to a private cause of action (see, Rocanova v Equitable Life, 83 NY2d, at 614, supra). If the statute does not permit a private right of action in favor of an insured, a fortiori, it cannot be construed to impose a tort duty of care flowing to the insured separate and apart from the insurance contract.
B
In plaintiff’s fifth cause of action, sounding in fraud, it alleges that defendants induced plaintiff to purchase and maintain the insurance policy notwithstanding their intent ab initia to refuse plaintiff’s claims for indemnification and then terminate the policy. Construing the amended complaint in the generous light to which it is entitled on a motion to dismiss (see, Leon v Martinez, 84 NY2d 83, 87-88), we nevertheless conclude that the cause of action is not stated.
The essential elements of a cause of action for fraud are "representation of a material existing fact, falsity, scienter, deception and injury” (Channel Master Corp. v Aluminium Ltd. Sales Corp., 4 NY2d, at 407, supra). At the very threshold, then, plaintiff must allege a misrepresentation or material omission by defendant, on which it relied, that induced plaintiff to purchase the policy of insurance. General allegations that defendant entered into a contract while lacking the intent to perform it are insufficient to support the claim (see, Rocanova, 83 NY2d, at 614, supra; cf., Sabo v Delman, 3 NY2d 155; Adams v Gillig, 199 NY 314).
Plaintiff contends that defendants implicitly misrepresented the integrity of their company through advertising and by conducting business in New York pursuant to the provisions of the Insurance Law which require insurers to deal with insureds fairly and in good faith. But implicit in every contract is a covenant of good faith and fair dealing (see, Dalton v Educational Testing Servs., 87 NY2d 384; Van Valkenburgh, Nooger & Neville v Hayden Publ. Co., 30 NY2d 34, 45, cert denied 409 US 875), which encompasses any promises that a reasonable promisee would understand to be included (Dalton, supra, citing Rowe v Great Atl. & Pac. Tea Co., 46 NY2d 62, 69). Certainly, a reasonable insured would understand that the insurer promises to investigate in good faith and pay covered claims. Where, as here, the complaint does not state the specific promises or omissions of material facts allegedly made by the insurer, it alleges nothing more than a breach of the contract and any covenants implied; it does not allege a cause of action for fraud in the inducement.
*319 Nor is a fraud claim supported by plaintiffs conclusory allegations that defendants were engaged in a scheme to receive premium payments without giving any benefit in return (see, e.g., CPC Intl. v McKesson Corp., 70 NY2d 268, 285-286; P.S. Auctions v Exchange Mut. Ins. Co., 105 AD2d 473, 475). Moreover, inasmuch as plaintiff has failed to adequately plead a fraud perpetrated against it, "no inference of fraudulent intent can be drawn in this case from the mere compilation” of the experiences of other dissatisfied policyholders (see, Rocanova, 83 NY2d, at 614, supra).
To the extent that plaintiff alleges that defendants engaged in a "sham” investigation to perpetuate their allegedly fraudulent scheme, those allegations merely evidence plaintiffs dissatisfaction with defendants’ performance of the contract obligations. Indeed, plaintiff concedes that defendants conducted an investigation, but argues that it provided an inadequate basis for defendants to deny plaintiffs claim. That allegation does not state a tort claim, it merely raises a question for the fact finder determining the breach of contract claim.
Nor can any inference of fraud be drawn from Continental Insurance Company’s nonrenewal of the policy. The parties apparently bargained for an open-ended term for the policy, and defendant gave plaintiff several months’ notice that it would expire on its anniversary date. Defendant informed plaintiff that the policy was not being renewed for "underwriting reasons,” and subsequently offered plaintiff a successor policy, although on terms plaintiff deemed unacceptable. Plaintiff argues that defendant’s actions were "vindictive,” but it points to no contractual or statutory obligations violated by defendant. Although plaintiff may have hoped, or even expected, that defendant would perpetuate or renew its policy without adjustment for plaintiffs experience, defendant was under no obligation to do so.
C
Plaintiff alleges in its second cause of action that defendants’ actions in failing to adequately investigate, in denying payment of the claim, and in failing to renew the policy after assertion of the claim were "careless, negligent, reckless and vindictive” and violated the laws of this State. Plaintiff’s claim amounts to nothing more than a claim based on the alleged breach of the implied covenant of good faith and fair dealing, and the use of familiar tort language in the pleading does not change the cause of action to a tort claim in the *320 absence of an underlying tort duty sufficient to support a claim for punitive damages (see, Rocanova, 83 NY2d, at 614, supra; Clark-Fitzpatrick, Inc. v Long Is. R. R. Co., 70 NY2d 382, 389-390).
The cause of action is duplicative of the first cause of action for breach of contract and should have been dismissed (see, Apfel v Prudential-Bache Sec., 183 AD2d 439).
D
In sum, the amended complaint fails to satisfy the first prong of the Rocanova pleading requirements because it fails to state a tort independent of the contract. Plaintiffs second, fourth and fifth causes of action should have been dismissed upon defendants’ motion. In view of this disposition, we have no occasion to address the sufficiency of the complaint’s claim for punitive damages under the remaining prongs of the Rocanova test.
Ill
Plaintiffs third cause of action seeks to state a claim based on a violation of General Business Law § 349. The statute makes unlawful deceptive acts or practices in conducting a business or furnishing a service. Any person who has been injured by reason of a violation of the section may bring an action to recover actual damages or $50, whichever is greater and the court may, if it finds defendant acted willfully or knowingly violated the section, triple the damages to a maximum of $1,000 and award attorney’s fees to a successful plaintiff (General Business Law § 349 [h]).
In Oswego Laborers’ Local 214 Pension Fund v Marine Midland Bank (85 NY2d 20), we stated that parties claiming the benefit of the section must, at the threshold, charge conduct that is consumer oriented. The conduct need not be repetitive or recurring but defendant’s acts or practices must have a broad impact on consumers at large; "[plrivate contract disputes unique to the parties * * * would not fall within the ambit of the statute” (id., at 25; see also, Teller v Bill Hayes, Ltd., 213 AD2d 141; Quail Ridge Assocs. v Chemical Bank, 162 AD2d 917, lv dismissed 76 NY2d 936). If a plaintiff meets this threshold, its prima facie case may then be established by proving that defendant is engaging in an act or practice that is deceptive in a material way and that plaintiff has been injured by it (id.; Varela v Investors Ins. Holding Corp., 81 NY2d 958).
*321 Plaintiff has not met the threshold requirement because defendants’ acts in selling this policy and handling the claim under it do not constitute consumer-oriented conduct. The parties were a major university acting through its director of insurance, and a large national insurance company. The policy was not a standard policy, although it contained standard provisions, but was tailored to meet the purchaser’s wishes and requirements. The premiums were in excess of $55,000 and the policy provided coverage for losses up to $10 million against various acts of employee dishonesty. The sale was handled by one of the largest brokerages in the Nation, Johnson & Higgins, which managed, through negotiation, to obtain several enhancements to the policy for plaintiff’s benefit and assisted it in presenting its loss claim to Continental.
Manifestly, this transaction is wholly unlike that in Oswego, which involved a bank customer receiving the standard forms and advice supplied to the consuming public at large, and in which the parties occupied disparate bargaining positions. The case before us involves complex insurance coverage and proof of loss in which each side was knowledgeable and received expert representation and advice. Although relief under the statute is not necessarily foreclosed by the fact that the transaction involved an insurance policy (see, Riordan v Nationwide Mut. Fire Ins. Co., 977 F2d 47, 51-52), this was not the "modest” type of transaction the statute was primarily intended to reach (see, Teller v Bill Hayes, Ltd., supra, at 146-147). It is essentially a "private” contract dispute over policy coverage and the processing of a claim which is unique to these parties, not conduct which affects the consuming public at large (see, Oswego, supra; Teller, supra; Quail Ridge Assocs., supra). Accordingly, the third cause of action should be stricken.
IV
Defendants contend that Supreme Court erred in dismissing its second affirmative defense, based on an "inventory shortage” exclusion in the policy. In the endorsement for "Employee Dishonesty Coverage,” defendants undertook to cover losses caused by employee dishonesty, which is defined in a policy endorsement to mean "dishonest acts committed by an 'employee,’ whether identified or not, acting alone or in collusion with other persons * * * with the manifest intent to (1) Cause [the insured] to sustain loss; and also (2) Obtain financial benefit [other than salary and other benefits to which the employee is entitled] for (a) the 'employee’ or (b) any person or organiza *322 tian intended by the 'employee’ to receive that benefit.” The endorsement excludes "Inventory shortages,” which it defines as "loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon (1) An inventory computation; or (2) A profit and loss computation” (emphasis added).
Supreme Court dismissed this affirmative defense because it concluded that "[ljosses resulting from employee dishonesty are not within inventory loss exclusions”. The Appellate Division affirmed. Defendants contend that those courts misapplied our holding in Ace Wire & Cable Co. v Aetna Cas. & Sur. Co. (60 NY2d 390), and that the affirmative defense should have survived plaintiffs cross motion to dismiss.
In Ace Wire, our attention was focused on the phrase "inventory computation” as it refers to the computation of the "amount” of loss arising from inventory shortages. In that case, it was adequately established that an employee had stolen 116 rolls of the insured’s inventory of cable. The defendant surety argued that the inventory shortage exclusion applied because the amount of the loss could be proven only by a computation of inventory. We rejected that broad application of the exclusion, and distinguished losses that were valued by comparison of pre- and posttheft counts of physical inventory, as recorded in inventory records, and losses that could be established only through generalized estimates arrived at by calculation of the dollar value of inventory before or after the theft.
Our decision in Ace Wire was driven by two competing considerations. On the one hand, construing the exclusion to apply to all proof of loss based on any form of inventory records would lead to the absurd result that an insured’s recovery would be limited to those losses that were substantiated only by a witness who had actually viewed the employee stealing the insured’s inventory (see, Ace Wire, 60 NY2d, at 398, supra). On the other hand, insurers include the inventory shortage exclusion in the employee dishonesty endorsements to protect themselves against "claims based on erroneous or falsified inventory or profit and loss computations * * * [and because] [ijnventory records and other business records are less reliable than other evidence in proving that a loss of goods has been sustained or that a loss is attributable to employee dishonesty” (Dunlop Tire & Rubber Corp. v Fidelity & Deposit Co., 479 F2d 1243, 1246). Accordingly, we held that to the extent an insured suffered losses that could be proven only by estimation of the loss by calculating the pre- and posttheft dollar value of the *323 inventory, such losses would fall within the exclusion. Nothing in Ace Wire, however, prevents insureds from relying on inventory records which document the actual inventory on hand.
The practical effect of that decision is that insureds are obligated to perform and record actual physical inventories on a regular basis so that inventory shortages will be discovered within a reasonable period of time and may be accurately valued. In that way, the insured will be indemnified for the actual losses timely discovered, while the insurer will be protected from indemnifying the insured for losses that may accumulate to excessive amounts over a period of years, and which can be proven only by estimation.
Here, plaintiff alleged that its losses occurred by Johnson’s falsification of documents, which it had presented to defendants. Thus, plaintiff’s averments would establish the existence of the loss by proof other than by estimation of an inventory shortage. On the other hand, plaintiff did not establish as a matter of law that it could prove the amount of its loss by other than dollar estimates. In an affidavit in support of its cross motion, an employee of plaintiff averred that the loss was revealed and measured by comparison of a 1990 physical inventory to accounting records. Depending on the nature of those accounting records, plaintiff may or may not be able to prove some or all of its losses by a method allowed by the holding of Ace Wire. Accordingly, it was error to dismiss the affirmative defense at this early pleading stage of the litigation, because plaintiff had yet to establish that the affirmative defense was meritless as a matter of law (see, CPLR 3211 [b]).
Alternatively, Supreme Court stated that even if it were incorrect in its conclusion that the exclusion did not apply to plaintiff’s claim, defendants "may well have waived the defense based on the policy exclusion by failing to include it in either of the disclaimer letters sent to plaintiff.” However, coverage is the net total of policy inclusions minus exclusions, and the failure to disclaim based on an exclusion will not give rise to coverage that does not exist (see, Schiff Assocs. v Flack, 51 NY2d 692, 697-698). While the insurer may waive the right to disclaim based on the insured’s noncompliance with a condition precedent, its right to disclaim coverage based on a policy exclusion can be defeated only by estoppel (see, id., at 699). Here, the insurer did nothing which should have led plaintiff to believe it was providing coverage for the claimed loss.
*324 V
Finally, defendants contend that Supreme Court erred in denying their motion to, dismiss the demand for attorneys’ fees, costs and disbursements upon the first cause of action for breach of contract. It is well established that an insured may not recover the expenses incurred in bringing an affirmative action against an insurer to settle its rights under the policy (Mighty Midgets v Centennial Ins. Co., 47 NY2d 12, 21; Grimsey v Lawyers Tit. Ins. Corp., 31 NY2d 953; Doyle v Allstate Ins. Co., 1 NY2d 439). Accordingly, defendants’ motion to strike should have been granted.
In sum, defendants’ motion to dismiss the second through fifth causes of action and the claim for attorneys’ fees, costs and disbursements should have been granted in its entirety and plaintiffs cross motion to dismiss defendants’ first and second affirmative defenses should have been denied.
Accordingly, the order of the Appellate Division should be reversed, with costs, in accordance with this opinion and the certified question answered in the negative.
Chief Judge Kaye and Judges Titone, Bellacosa, Smith, Levine and Ciparick concur.
Order reversed, with costs, defendants’ motion to dismiss the second through fifth causes of action in the amended complaint and the demand for attorneys’ fees granted, plaintiffs cross motion to dismiss the first and second affirmative defenses of the amended answer denied, and certified question answered in the negative.