A. Lorenzo BARROSO, S.A., Plaintiff,

v.

**POLYMER RESEARCH CORP.
OF AMERICA, Defendant.**

No. 99–CV–3341 (ILG).

United States District Court,
E.D. New York.

Dec. 28, 1999.

Matthew J. Sava, Shapiro, Forman & Allen LLP, New York City, for Defendant.

Stephen M. Lazare, Lazare, Potter, Giacovas & Kranjac LLP, New York City, for plaintiff.

## MEMORANDUM & ORDER

GLASSER, District Judge.

Plaintiff A. Lorenzo Barroso, S.A. ("Barroso"), is a corporation organized under the laws of Spain, located in Argentona, Spain. Barroso is a manufacturer of machinery and equipment for the food industry. Defendant Polymer Research Corp. of America ("Polymer") is a New York corporation with its principal place of business in Brooklyn, New York. Polymer's primary business is polymer chemistry. The present action arises out of a commercial dispute between the parties concerning the development of a chemical formula for use in colorizing aluminum wire. Plaintiff's complaint (the "Complaint") alleges breach of contract; money had and received; violation of New York General Business Law § 349; fraudulent inducement; and, negligent misrepresentation. Defendant now moves, under Rule 12(c) of the Federal Rules of Civil Procedure, for judgment on the pleadings on all but the breach of contract claim. Defendant also moves to strike plaintiff's claim for punitive damages, stemming from the underlying cause of action for fraud. For the reasons that follow, defendant's motions are granted.

## BACKGROUND

The Complaint alleges that on November 6 and 7, 1996, two representatives of Barroso, Pedro Garcia and Sagar Lorenzo, visited Polymer's Brooklyn facilities to discuss whether Polymer could provide Barroso with a non-toxic chemical formula for use in colorizing various metal objects produced and distributed by Barroso. (Complaint at ¶ 6.) In discussions with Polymer's Executive Vice–President, John M. Ryan, Garcia and Lorenzo were told that Polymer had developed a process Ryan called "chemical grafting." (*Id.* at ¶¶ 7–8.) According to Ryan, this process permitted the instantaneous subsurface application of color onto metal (including aluminum). (*Id.* at ¶ 8.)

Ryan told Garcia and Lorenzo that the process involved little more than the submersion of metal objects into a solution containing a chemical formula developed by Polymer. (*Id.* at ¶ 9.) The Barroso men were also told that objects so treated would be available for immediate use, and that aluminum wire could be colorized through this process at a rate of up to 1,000 meters per minute. (*Id.*) Garcia and Lorenzo responded to these claims with "numerous technical questions," and received assurances from Ryan that (i) the process could be applied to aluminum of various thickness; (ii) results would not vary according to the speed at which the formula was applied; (iii) the formula could be applied without modification to aluminum wire that had been treated in the manner Barroso routinely treated its aluminum wire; and, (iv) aluminum once treated with the formula could withstand high temperatures, bending, and cutting, without effect on the engrafted colors. (*Id.* at ¶ 10.)[1]

---

1. Plaintiff alleges "upon information and belief" that Polymer's "*modus operandi*" was to send "false and misleading advertising to specifically identified consumers within various

Garcia and Lorenzo were shown several samples of metal that Polymer represented had been colorized by the process. (*Id.* at ¶ 11.) But when they asked to see a demonstration of the process, they were told that the chemical formula was not available at the time, and also that Polymer had non-disclosure agreements with its customers that would not permit such a demonstration. (*Id.*) Garcia and Lorenzo accepted Polymer's verbal assurances in lieu of the demonstration, and entered into an agreement with Polymer (the "Agreement"). (*Id.* at ¶¶ 11–12.)

Under the terms of the Agreement, Barroso paid Polymer $90,000, in exchange for Polymer's commitment to develop a chemical formula that would colorize aluminum by the grafting process described by Ryan. The Agreement also set forth various technical specifications, and expressly confirmed the representations Ryan had made to Garcia and Lorenzo concerning the capacities of the colorization process. (*Id.* at ¶ 12.) The Agreement further provided that Barroso was to receive the formula, as well as exclusive rights to the formula and to any patents arising from its development. (*Id.* at ¶ 13.) In the Agreement, Polymer also undertook to deliver a sample coil of colorized aluminum to Barroso within four weeks of payment of the $ 90,-000, which Barroso made on December 18, 1996. (*Id.*) Finally, the Agreement called for delivery of the formula and its patent no later than June 18, 1997. (*Id.* at ¶ 14.)

Polymer did deliver an initial sample of colorized aluminum wire on January 27, 1997. (*Id.* ¶ 15.) That sample, however, was deficient. The "engrafted" color dissolved in an ordinary solvent, failed to resist heat, and did not withstand a lamination process. (*Id.*) Polymer then sent Barroso a sample of the formula itself. (*Id.* at ¶ 16.) Contrary to the Agreement's specifications, that sample required curing at 185C̄ for 30 minutes. Two more samples followed, both of which applied like paint, without penetrating the wire; failed to resist high temperatures; and broke or peeled with bending of the wire. (*Id.*)

Polymer has failed to date to deliver a formula to Barroso that complies with the specifications set forth in the Agreement, despite repeated complaints by Barroso, and assurances offered by Polymer in response to those complaints. (*Id.* at ¶ 17.) Barroso now states that the process Polymer promised to develop cannot be, because it is "presently not possible." (*Id.* at ¶ 18.) Barroso also states that Polymer "knew, or should have known" that this was the case at the time it entered into the Agreement. (*Id.*) In November 1998, Barroso demanded return of its $90,000 payment, plus interest and other damages. (*Id.* at ¶¶ 19–20.) Polymer refused this demand. (*Id.* at ¶ 20.) In June of this year, Barroso initiated this lawsuit. Barroso alleges, and defendant does not contest, diversity jurisdiction. (*Id.* at ¶ 4.) Barroso also alleges, without contest, that the dispute between the parties arose in this district. (*Id.* at ¶ 5.) Accordingly, and in the absence of allegations to the contrary, this Court assumes that the dispute is governed by New York law.

### DISCUSSION

A motion for judgment on the pleadings under Fed.R.Civ.P. 12(c) is analyzed under the same standard as a motion under Fed. R.Civ.P. 12(b)(6) to dismiss for failure to state a claim. *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir.1994). Under that standard, "a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant; it should not dismiss the complaint unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his [its] claim that would entitle [it] to relief." *Id.*

manufacturing industries" containing similar representations about its colorization technol-

ogy. (*Id.* at ¶ 35.)

## I. *Money Had and Received*

■ Defendant argues that plaintiff's claim for money had and received should be dismissed. To state a claim for money had and received under New York law, a plaintiff must allege: "(1) defendant received money belonging to the plaintiff; (2) defendant benefitted from the receipt of money; and (3) under principles of equity and good conscience, defendant should not be permitted to keep the money." *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank*, 731 F.2d 112, 125 (2d Cir. 1984). The claim "is recognized as an action in implied contract," but as the New York Court of Appeals has observed,

> the name is something of a misnomer because it is not an action founded on contract at all; it is an obligation which the law creates in the absence of agreement when one party possesses money that in equity and good conscience he ought not to retain and that belongs to another.

*Parsa v. State*, 64 N.Y.2d 143, 148, 485 N.Y.S.2d 27, 474 N.E.2d 235 (1984). The action "allows plaintiff to recover money which has come into the hands of the defendant 'impressed with a species of trust,'" and makes a remedy available particularly where "one man has obtained money from another through the medium of oppression, imposition, extortion, or deceit, or by the commission of a trespass." *Id.* (citations and internal quotations omitted).

■ Barroso concedes that if there were no factual issue on the face of the pleadings that a contract controls the rights of the parties, no claim for money had and received would lie. But, Barroso continues, such an issue is presented by allegations made by counsel to Barroso in an affidavit in support of its opposition to defendant's motion here. According to those allegations, defendant's "original counsel claimed, albeit incredibly, that she was not familiar with the contract (later described in the Complaint), thereby implying that the defendant might, at some

point, challenge the 'Agreement' alleged by plaintiff." (Lazare Aff. at ¶ 3.) Barroso also points to defendant's Answer, which includes as an affirmative defense that the Agreement was only for a "feasibility" study. (*Id.*, citing Answer at ¶ 55.)

If a court upon a motion for judgment on the pleadings decides to consider, and not to exclude, matters outside the pleadings—such as the Lazare affidavit—"the motion shall be treated as one for summary judgment and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed.R.Civ.P. 12(b). Conversion to summary judgment is unnecessary in this instance, however, because it is clear beyond any doubt that plaintiff has failed sufficiently to plead the elements of a *prima facie* claim of money had and received. There is certainly no doubt on the face of the pleadings that a contractual agreement existed between the parties, although issue has clearly been joined about the terms of that agreement. It is of no moment whether that agreement be termed "express," or "implied in fact"; what cannot be disputed is that it was not "implied in law," as plaintiff has suggested. The "implied in law" contract—or "quasi-contract" as it is also called—is, as the Court of Appeals suggested in *Parsa*, a misnomer, because claims made under that rubric sound not in contract, but in the law of restitution. The remedies of restitution exist for the redress of unjust enrichment. *See* E. Allan Farnsworth, Contracts §§ 2.20, 3.10 at 103, 135 (2d ed.1990). Facts supporting such a claim have simply not been pleaded here. Accordingly, defendant's motion to dismiss plaintiff's claim for money had and received must be granted.

## II. *GBL § 349*

Defendant argues that plaintiff's claim under the New York GBL must be dismissed for failure to plead facts sufficient to show that defendant engaged in the sort of "consumer-oriented" conduct within the

intended ambit of the statute. Defendant is correct.

■ GBL § 349(a) declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service." The statute provides for a private right of action to any person injured by the deceptive acts or practices committed by a business. *Id.* at § 349(h). A claim under the statute must "as a threshold matter, ... charge conduct of the defendant that is consumer-oriented." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.,* 85 N.Y.2d 20, 25, 623 N.Y.S.2d 529, 647 N.E.2d 741 (1995), defined as conduct that "potentially affects similarly situated consumers." *Id.* at 26, 623 N.Y.S.2d 529, 647 N.E.2d 741. In making a *prima facie* case that conduct is "consumer-oriented," a plaintiff must "demonstrate that the acts or practices have a broader impact on consumers at large." *Id.* at 25, 623 N.Y.S.2d 529, 647 N.E.2d 741. Of significance to this case, it is also well established that "[p]rivate contract disputes, unique to the parties ... would not fall within the ambit of the statute." *New York Univ. v. Continental Ins. Co.,* 87 N.Y.2d 308, 320, 639 N.Y.S.2d 283, 662 N.E.2d 763 (1995) (citation and internal quotation omitted).

■ Plaintiff attempts to raise an issue under the GBL by alleging that Polymer's *"modus operandi"* was to target manufacturers with "false and misleading advertising." (*Complaint* at ¶ 35.) Noting that a claim under GBL § 349 may be maintained by business entities as well as individuals, plaintiff concludes that it has sufficiently alleged the injury to the public at large necessary to sustain a claim under the General Business Law. Under the New York Court of Appeals's most recent interpretation of GBL § 349, this argument fails.

In *New York Univ.,* the Court struck plaintiff's claim under the GBL. Noting that the insurance contract issue in the case "was not a standard policy ... but was tailored to meet the purchaser's wishes and requirements," the Court stated that such a transaction "was not the 'modest' type ... the statute was primarily intended to reach." *Id.* at 321, 639 N.Y.S.2d 283, 662 N.E.2d 763. In words applicable *mutatis mutandis* here, the Court described the case as "essentially a 'private' contract dispute over policy coverage and the processing of a claim which is unique to these parties, not conduct which affects the consuming public at large." *Id.* The Court reached these conclusions mandating dismissal of plaintiff's GBL claim notwithstanding plaintiff's allegations of the defendant insurance company's "bad-faith practices with respect to policyholders nationwide." *Id.* at 314, 639 N.Y.S.2d 283, 662 N.E.2d 763.

*New York University* makes clear that it is not sufficient to plead a claim under GBL § 349 merely to allege a *"modus operandi"* of similar conduct toward other business entities, when the underlying transaction is "essentially a private contract." The pleadings in this case leave no doubt that the dispute between the parties is just such a contract, the provisions of which were tailored to the plaintiff's specific wishes and requirements. The conduct complained of does not, on its face, affect the consuming public. Under the Court of Appeals's precedents, plaintiff's claim under GBL § 349 must be dismissed.

### III. *Fraudulent Inducement*

■ In plaintiff's fourth cause of action, sounding in fraud, it alleges that defendant made representations concerning its ability to produce a chemical formula to plaintiff's specifications that it knew or should have known were false. Plaintiff further alleges that defendant continued to misrepresent the progress it was making as it continued to miss deadlines for final delivery of the formula. Plaintiff points to "numerous similar lawsuits" filed by other customers of defendant as evidence supporting its

**44**

claim that defendant's conduct was knowingly fraudulent. (Complaint at ¶ 44.)

█ It is well established under New York law that a cause of action seeking damages for fraud cannot be sustained when the only fraud charged relates to a breach of contract. *Jim Longo, Inc. v. Rutigliano,* 251 A.D.2d 547, 548, 674 N.Y.S.2d 730, 731 (2d Dep't 1998); *Alamo Contract Bldrs. v. CTF Hotel Co.,* 242 A.D.2d 643, 644, 663 N.Y.S.2d 42, 43 (2d Dep't 1997) ("The plaintiff also failed to state a cause of action to recover damages for fraud ... since it failed to allege that the defendant made a material representation concerning an intention to perform a duty which is collateral or extraneous to the contract between the parties."). Plaintiff's fraud claim stems entirely from an alleged breach of duties assumed under an agreement with defendant. There are no allegations of representations collateral or extraneous to that agreement. The Court of Appeals's remarks in dismissing plaintiff's cause of action for fraud are apposite here too: "[it] amounts to nothing more than a claim based on the alleged breach of the implied covenant of good faith and fair dealing, and the use of familiar tort language in the pleading does not change the cause of action to a tort claim in the absence of an underlying tort duty sufficient to support a claim for punitive damages." *New York Univ.,* 87 N.Y.S.2d at 319–20, 639 N.Y.S.2d 283, 662 N.E.2d 763. Certainly allegations that defendant overstated the nature of its services and its ability to perform under the agreement do not suffice to transmute a contract dispute into a tort action. Accordingly, plaintiff's fourth cause of action fails to state a claim and must be dismissed.

## IV. *Negligent Misrepresentation*

█ The foregoing analysis of plaintiff's fraud claim applies with similar force to plaintiff's claim for negligent misrepresentation. A claim for negligent misrepresentation is not actionable unless the alleged misrepresentation is a statement expressed directly to the plaintiff, with knowledge or notice that it will be acted upon, by one to whom the author is bound by some relation of duty, arising out of contract or otherwise, to act with care if he acts at all. *White v. Guarente,* 43 N.Y.2d 356, 362–63, 401 N.Y.S.2d 474, 372 N.E.2d 315 (1977) (citation omitted); *see also Ultramares Corp. v. Touche,* 255 N.Y. 170, 180–81, 174 N.E. 441 (1931) (discussing the extension of principles of third-party beneficiary standing to promises that "bespeak the assumption of a duty to make reparation directly to the individual members of the public if the benefit is lost"); *Glanzer v. Shepard,* 233 N.Y. 236, 241, 135 N.E. 275 (1922) (allowing recovery on a tort theory to purchaser of a quantity of beans from a public weigher who had certified an incorrect weight to the seller, and observing that the defendants had been "held, not merely for careless words ... but for the careless performance of a service—the act of weighing—which happens to have found in the words of a certificate its culmination and its summary"). The rule concerning fraud also applies in the context of negligent misrepresentation: "a simple breach of contract is not to be considered a tort unless a legal duty independent or the contract itself has been violated." *Clark–Fitzpatrick, Inc. v. Long Island Rail Road Co.,* 70 N.Y.2d 382, 389, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987).[2]

2. A different question would be presented had plaintiff alleged negligent performance of the contract. *See William Wrigley Jr. Co. v. Waters,* 890 F.2d 594, 602 (2d Cir.1989) (observing that "[i]t is well settled under New York law that negligent performance of a contract may give rise to a claim sounding in tort as well as one for breach of contract ... which may be submitted to the trier of the case alternatively"); *Rosenbaum v. Branster Realty Corp.,* 276 A.D. 167, 168, 93 N.Y.S.2d 209, 211 (1st Dep't 1949) ("Where a person contracts to do certain work he is charged with the common law duty of exercising reasonable care and skill in the performance of the work required to be done by the contract. It is the breach of the duty imposed by law and

 

Plaintiff insists that a "special relationship" with defendant, giving rise to duties independent of those imposed under the contract at issue, came into being when defendant declared that it had "never failed yet with any of its customers," and that it "would never take on a project which it could not solve." (Complaint at ¶¶ 40–42.) But those statements were made in the course of negotiation between the parties—both sophisticated business entities—as an inducement to enter into an arms-length contractual relationship. Nothing in its allegations suggests that plaintiff lacked the wherewithal to subject those statements to further scrutiny had it chosen to do so. And the fact that it entered into an agreement that spelled out technical specifications in detail suggests that it did not take the statements at face value. Taken together, these facts—all evident on the face of the pleadings—establish that a cause of action for negligent misrepresentation does not lie, and accordingly, that plaintiff's fifth cause of action must be dismissed.

## V. *Punitive Damages*

Plaintiff premises its demand for punitive damages upon its fraud claim. Because that claim is dismissed for the reasons stated above, the demand for punitive damages must also be stricken. It is worth observing, in any event, that under New York law a party in a contract action is generally confined to the remedies on the contract. *See Board of Education v. Sargent, Webster, Crenshaw & Folley,* 71 N.Y.2d 21, 29, 523 N.Y.S.2d 475, 517 N.E.2d 1360 (1987) ("Parties to a contract have the power to specifically delineate the scope of their liability at the time the contract is formed. Thus, there is nothing unfair in defining a contracting party's liability by the scope of its promise as reflected by the agreement of the parties. Indeed, this is required by the very nature of contract law, where potential liability is determined in advance by the parties.").

not of the contract obligation which consti-

## CONCLUSION

For the reasons stated above, plaintiff's claims for money had and received, violation of GBL § 349, fraudulent inducement, and negligent misrepresentation are dismissed. In addition, plaintiff's claim for punitive damages is stricken.

SO ORDERED.