**EXXONMOBIL INTER–AMERICA, INC. Plaintiff,**

v.

**ADVANCED INFORMATION ENGINEERING SERVICES, INC., f/k/a Veridian Engineering, Inc., Defendant.**

**No. 04–CV–00913 (CM).**

United States District Court,
S.D. New York.

July 22, 2004.

Joseph T. Walsh, III, McCusker Anselmi Rosen Carvelli & Walsh, PA, New York, NY, for Plaintiff.

Christopher D. Liguori, Linda L. Listrom, Jenner & Block LLP, Chicago, IL, Jennifer Wilcox Darger, Off, Darger & Errante LLP, New York, NY, for Defendant.

Amanda Susan Amert, Jenner & Block LLP, Chicago, IL, for Defendant and Counter Claimant.

Wendy B. Green, McCusker Anselmi Rosen Carvelli & Walsh, PA, New York, NY, for Plaintiff and Counter Defendant.

## DECISION AND ORDER GRANTING DEFENDANT'S PARTIAL MOTION TO DISMISS

McMAHON, District Judge.

Plaintiff Exxonmobil Inter–America, Inc., commenced this diversity action against Defendant Advanced Information Engineering Services, Inc., seeking compensatory and punitive damages for breach of contract, breach of express warranty, breach of implied warranty of merchantability, breach of implied warranty of fitness for a particular purpose, breach of implied covenant of good faith and fair dealing, conversion, unjust enrichment, and deceptive business practices, all in violation of New York law.

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendant moved to dismiss the claims sounding in breach of implied covenant of good faith, conversion, and deceptive business practices. Plaintiff has stipulated to a dismissal, without prejudice, of the breach of good faith and conversion claims, and so all that is left of the motion is the claim of deceptive business practices.

For the following reasons, Defendant's motion to dismiss the claim is granted.

### Standard for Motion to Dismiss

Dismissal of a complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) is proper where "it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). The test is not whether the plaintiff is ultimately likely to prevail, but whether he is entitled to offer evidence to support his claims. *Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998). The court assumes that all factual allegations in the complaint are true, and draws all reasonable inferences in Plaintiff's favor. *EEOC v. Staten Island Sav. Bank,* 207 F.3d 144 (2d Cir.2000). In ruling upon such a motion, the court considers only the allegations stated in the complaint and any documents attached to, or incorporated by reference into, the complaint. *Newman & Schwartz v. Asplundh Tree Expert Co.,* 102 F.3d 660 (2d Cir.1996).

### Background

This complaint arises out of an information technology provider's alleged false procurement and breach of a contract to supply Exxonmobil Inter–America (Exxon) with hardware, software and support services for a truck-tracking computer system. Plaintiff alleges that Defendant unlawfully failed to disclose that its ability to provide its product depended on its relationship with a subcontractor, failed to provide all of its agreed-upon goods and services once its relationship with the subcontractor ended, and failed to refund Exxon for the goods and services that were paid for, but not provided. Plaintiff asserts that these actions amounted to a breach of contract, a breach of express and implied warranties, conversion, unjust enrichment, and deceptive business practices.

Plaintiff Exxon provides technical, financial, accounting, and other advisory and coordinating services to companies in Latin America and the Caribbean. Defendant Advanced Information Engineering Services (AIES), formerly known as Veridian Engineering, sells information technology, including hardware, software, and related support services.

In 1999, Exxon, in an effort to update its non-Y2K-compliant truck-tracking system, solicited bids from vendors for a new On–

Truck Computer (OTC) system. After considering multiple proposals, Exxon eventually met with AIES, which represented to Exxon that it had sold OTC systems both to Lucent Technologies and the Coca–Cola Corporation. Exxon allegedly made several specifications during the proposal process with AIES. First, it requested both world-wide and local support for the OTC system. Second, Exxon specified that it wanted an OTC system with open architecture software, that is, software capable of having add-on products and upgrades designed and installed by someone other than the manufacturer. AIES revised its initial proposal to include and satisfy Exxon's specifications.

Exxon and AIES entered into a contractual relationship, under which AIES was to provide Exxon with an Automatic Vehicle Location (AVL) system to track the location and movement of Exxon's trucks throughout twenty-nine Latin American countries. Because this was a newly developed system equipped with newly developed software, the parties' agreement provided that the installation and implementation of the AVL system would be divided into four stages, with each stage building upon and adding to the prior stage.

Phase One under the contract called for the installation of the specified software and hardware into thirty of Exxon's trucks and two remote monitoring stations, located in terminals in the Dominican Republic and El Salvador. AIES hired a subcontractor, Datumcom Corp. (Datumcom) to accomplish these installations, and to address any system errors or hardware problems that arose in connection with Exxon's use of the AVL system. Exxon alleges that the AVL system encountered some software and hardware errors, but that the parties agreed to resolve those errors in the transition to Phase Two of the contract.

Phase Two under the contract called for system upgrades to the thirty Exxon trucks originally outfitted with the AVL system, as well as 173 additional truck installations in the year 2000, with an additional 61 truck installations in 2001.

According to the complaint, on or about June 17, 2001, Exxon learned that Datumcom was terminating its subcontractor relationship with AIES, which allegedly left AIES incapable of providing system support to any of the countries in which Exxon operated AVL-outfitted trucks, and incapable of installing the additional Phase Two installations. AIES allegedly only completed a portion of the 173 installations scheduled for 2000, and none of the 61 installations scheduled for 2001.

Exxon alleges that it made many intensive efforts to communicate with AIES, asking Defendant to reinstate its relationship with Datumcom, or hire a new subcontractor to replace it, both of which AIES failed to do.

On September 7, 2001, the AVL system software AIES had installed allegedly crashed and ceased to operate. Lacking Datumcom's services, AIES was unable to remedy these errors and stopped responding to Exxon's warranty claims. AIES made a series of proposals to Exxon to resolve the system errors, including a proposal to proceed with the remaining truck installations. But Exxon declined to go forward with the future truck installations until the system problems were resolved.

According to the complaint, Exxon paid AIES $785,724 for the failed installation and operation of the AVL system. Furthermore, Exxon alleges that as a result of the total system crash, it has suffered extensive damages totaling at least $4,695,000.

Count One of the complaint alleges that AIES breached its contract with Exxon.

Count Two alleges a breach of express warranty. Count Three alleges a breach of implied warranty of merchantability. Count Four alleges a breach of implied warranty of fitness for a particular purpose. Count Five alleges breach of implied covenant of good faith and fair dealing. Count Six alleges conversion of the $785,724 AIES received from Exxon, but failed to refund after the system failure. Count Seven alleges unjust enrichment. And Count Eight alleges deceptive business practices in violation of New York's General Business Law.

AIES filed a counterclaim alleging Exxon's breach of contract, and moved to dismiss Counts Five, Six, and Eight of Exxon's complaint. Exxon stipulated to a dismissal, without prejudice, of Counts Five and Six.

## Discussion

■ New York law prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. GEN. BUS. LAW § 349 (McKinney's 2001). To state a cause of action under § 349, a plaintiff must allege (1) a deceptive consumer-oriented act or practice which is misleading in a material respect, and (2) injury resulting from such act. *E.g. Andre Strishak & Assocs., P.C. v. Hewlett Packard Co.*, 300 A.D.2d 608, 752 N.Y.S.2d 400, 401 (2d Dep't 2002).

■ The New York courts have held that a threshold matter in § 349 cases is whether or not the act in question was consumer-oriented. In *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 623 N.Y.S.2d 529, 647 N.E.2d 741 (N.Y.1995), the New York Court of Appeals examined the legislative history of the statute, and concluded that, "[a]s shown by its language and background, section 349 is directed at wrongs against the consuming public." *Id.* at 24–25, 623 N.Y.S.2d 529, 647 N.E.2d 741.

Consumer-oriented conduct does not necessarily require repetition or a pattern of deceptive behavior, but to state a claim of consumer-oriented deception, a plaintiff must allege that the disputed acts or practices have a broader impact on consumers at large. *Id.* at 25, 623 N.Y.S.2d 529, 647 N.E.2d 741.

The Court concluded that "[p]rivate contract disputes, unique to the parties, for example, would not fall within the ambit of the statute." *Id.* (citing *Genesco Entm't v. Koch*, 593 F.Supp. 743, 752 (S.D.N.Y. 1984)). Therefore, the *Oswego* court found that a defendant bank was liable under § 349 for material omissions and misrepresentations because the bank treated the plaintiffs "as any customer entering the bank to open a savings account, furnishing the[m] with standard documents presented to customers upon the opening of accounts." *Id.* Since the account openings at the center of the dispute "were not unique to these two parties, nor were they private in nature or a single shot transaction," the "consumer-oriented act" prong of a § 349 claim was satisfied. *Id.* (internal citations and quotations omitted).

In *New York University v. Continental Insurance Co.*, 87 N.Y.2d 308, 639 N.Y.S.2d 283, 662 N.E.2d 763 (1995), however, the Court distinguished *Oswego*, and held that an insurance provider was not liable under § 349 for its denial of commercial liability coverage to a university regarding a theft at the university bookstore. *New York University* involved "complex insurance coverage and proof of loss in which each side was knowledgeable and received expert representation and advice." *Id.* at 290, 662 N.E.2d 763. Furthermore, the plaintiff did not meet the "consumer-oriented act" requirement since the disputed insurance policy "was not a standard policy," and "although it contained standard provisions ... was tai-

lored to meet the purchaser's wishes and requirements." *Id.* Thus, the Court held,

this was not the "modest" type of transaction the statute was primarily intended to reach. It is essentially a "private" contract dispute over policy coverage and the processing of a claim which is unique to these parties, not conduct which affects the consuming public at large. Accordingly, the [§ 349] cause of action should be stricken.

*Id.* at 291, 662 N.E.2d 763.

Several other § 349 cases have been similarly dismissed for failure to establish the "consumer-oriented act" element. For example, in *Teller v. Bill Hayes, Ltd.*, 213 A.D.2d 141, 630 N.Y.S.2d 769 (2d Dep't 1995), the Appellate Division noted that

[c]ourts have traditionally applied General Business Law § 349 in the context of consumer sales transactions. The typical violation contemplated by the statute involves an individual consumer who falls victim to misrepresentations made by a seller of consumer goods usually by way of false and misleading advertising. And, the New York cases where plaintiffs have recovered under section 349(h) further reflect its consumer orientation since they uniformly involve transactions where the amount in controversy is small.

*Id.* at 774 (internal quotations and citations omitted).

Furthermore, the court continued,

The statute was intended to empower consumers[,] to even the playing field in their disputes with better funded and superiorly situated fraudulent businesses. It was not intended to supplant an action to recover damages for breach of contract between parties to an arm's length contract. Indeed it has been observed [that the statute] should not be permitted to become an adjunct to ordinary commercial litigation, arbitrarily raising the stakes through their one-way attorney's fees provisions. The goals of [§ 349] were major assaults upon fraud against consumers, particularly the disadvantaged.

*Id.* at 774 (internal citations and quotations omitted).

The *Teller* court found no liability where an individual, after lengthy negotiations, hired a contractor she had met casually on the street to renovate her house. The court concluded that the parties' rough parity in bargaining power, and the contract's high price of $350,000, belied the existence of a run-of-the-mill consumer contract. Instead, the *Teller* contract was found to be an arm's-length contract, not within the ambit of § 349. *Id.* at 775.

The New York courts have also suggested that a consumer, for § 349 purposes, is one "who purchase[s] goods and services for personal, family or household use." *Sheth v. N.Y. Life Ins. Co.*, 273 A.D.2d 72, 709 N.Y.S.2d 74 (1st Dep't 2000) (holding that a deceptive business practice claim should be dismissed if it alleges actions that were directed only at prospective insurance agents, and not individual consumers); *see also Cruz v. NYNEX Info. Res.*, 263 A.D.2d 285, 703 N.Y.S.2d 103 (1st Dep't 2000) (holding that agreements with businesses generally do not come within the ambit of consumer protection statutes). New York courts have generally found that business-to-business transactions do not give rise to § 349 claims. *E.g. Citipostal, Inc. v. Unistar Leasing* 283 A.D.2d 916, 724 N.Y.S.2d 555, 558 (4th Dep't 2001) ("The acts complained of are limited to business rather than consumer leases, and the conduct complained of cannot carry over to consumer transactions."); *Sutton Assocs. v. Lexis–Nexis*, 196 Misc.2d 30, 761 N.Y.S.2d 800, 802 (N.Y.Sup.Ct.2003) (dismissing a § 349 claim that alleged only "a private commercial dispute involving the two businesses involved in the transac-

tion"). As this court held in *Genesco Entertainment v. Koch*, 593 F.Supp. 743 (S.D.N.Y.1984), "transactions involving complex arrangements, knowledgeable and experienced parties and large sums of money ... are different in kind and degree from those that confront the average consumer who requires the protection of a statute against fraudulent practices." *Id.* at 752 (finding § 349 inapplicable to dealings between large concert promoter and the City of New York regarding the leasing of Shea Stadium).

▇▇▇ Section 349 liability does not lie where the disputed private transaction does not have "ramifications for the public at large." *Canario v. Gunn*, 300 A.D.2d 332, 751 N.Y.S.2d 310, 310 (2d Dep't 2002) (affirming dismissal of a § 349 claim where "the misrepresentation had the potential to affect only a single real estate transaction involving a single unique piece of property," and where the "only parties truly affected by the alleged misrepresentation in this case are the plaintiffs and the defendants"). The meaning of this proposition is twofold. First, § 349 liability attaches primarily where a party's misrepresentations are boilerplate and have the potential to be repeated in order to deceive numerous similarly situated buyers. *Oswego* 85 N.Y.2d 20, 623 N.Y.S.2d 529, 647 N.E.2d 741 (1995); *Gaidon v. Guardian Life Ins. Co. of America*, 94 N.Y.2d 330, 704 N.Y.S.2d 177, 725 N.E.2d 598 (1999) (finding liability where an insurance company's general marketing scheme of life insurance policies was deceptive). Conversely, contracts that are not "standard-issue," but are instead designed to provide services "tailored to meet the [plaintiff's] wishes and requirements" are not consumer-oriented for § 349 purposes. *N.Y. Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 639 N.Y.S.2d 283, 290, 662 N.E.2d 763 (1995); *Acquista v. N.Y. Life Ins. Co.*, 285 A.D.2d 73, 730 N.Y.S.2d 272 (1st Dep't 2001) (distinguishing *New York University* and find-

ing liability for "standard-issue" insurance policy).

▇▇▇ Second, allegedly deceptive acts that occur between relatively sophisticated entities with equal bargaining power do not give rise to § 349 liability. Large businesses are not the small-time individual consumers § 349 was intended to protect. *Genesco* 593 F.Supp. 743. While the "consumer-orientated act" prong does not preclude the application of § 349 to disputes between businesses per se, it does severely limit it. *Cruz*, 263 A.D.2d 285, 703 N.Y.S.2d 103, 107 (1st Dep't 2000). Contracts to provide commodities that are available only to businesses do not fall within the parameters of § 349. *Id.* (finding no liability in a contract to sell advertisement space in the Yellow Pages, since this was a commodity available only to businesses, and not the public at large).

▇▇▇ Based on this analysis, I conclude that AIES' actions regarding its contractual obligations with Exxon were not consumer-oriented, and so AIES cannot be liable for deceptive business practices under § 349.

First, according to the complaint, the Exxon–AIES contract was not boilerplate or run-of-the-mill, but instead called for a customized installation and implementation plan for the AVL system. As ¶¶ 8–16 of the complaint allege, Exxon solicited bids and proposals from a number of OTC system providers. AIES representatives attended a presentation in which Exxon enumerated its requirements for an OTC system. AIES then revised its initial proposal to "include and satisfy Inter–America's specifications for the OTC system." (Compl.¶ 15.) The parties entered into their agreement only after negotiating the specifications of the system AIES was to provide. (Compl.¶ 17.) Such negotiations and customizations suggest that the contract was tailored to meet Exxon's wishes

and requirements, and so could not be consumer-oriented for § 349 purposes. *See Acquista*, 730 N.Y.S.2d 272.

Second, Exxon was not the type of consumer § 349 was intended to protect. Exxon was a large business, not an individual who purchased goods and services for personal, family, or household use. *See Sheth*, 709 N.Y.S.2d 74. Furthermore, Exxon and AIES are both sophisticated contracting entities with equal bargaining power, and the contract between them was for a business-only commodity, not a common consumer good. *See Cruz*, 703 N.Y.S.2d 103. Exxon does not need to invoke § 349, which was designed to protect "the little guy" from false advertising, pyramid schemes, bait-and-switch sales tactics, and other mischievous machinations by swindlers and scallywags. *See Teller*, 630 N.Y.S.2d 769.

Exxon tries to save its § 349 claim by providing the court with documentary evidence (not attached to or referenced in the complaint), which is meant to demonstrate that AIES' AVL system is a non-unique, off-the-shelf product, and that AIES has a broad consumer base. Exxon's attempt to construe its contract with AIES as a consumer-oriented run-of-the-mill contract with implications for thousands of buyers is unavailing.

While I am unable to consider materials extrinsic to the complaint for purposes of a 12(b)(6) motion, *Newman & Schwartz v. Asplundh Tree Expert Co.*, 102 F.3d 660 (2d Cir.1996), I note that Exxon still cannot state a viable claim under § 349. Even if AIES' actions had the potential to deceive and defraud thousands of possible customers like Exxon, this does not change the fact that Exxon, one of the world's largest corporations, is not the kind of consumer § 349 was intended to protect.

Defendant's motion to dismiss Count Eight of the complaint is granted.

This constitutes the decision and order of the Court.