In the Matter of the Estate of ABRAHAM ABRAMOWITZ, Deceased. FIRST NATIONAL CITY BANK, as Coexecutor of ABRAHAM ABRAMOWITZ, Deceased, Appellant; DORIS ROSEN, Respondent.

Second Department, March 20, 1972.

*Gladstone & Lowell (Arthur N. Seiff* and *Morris A. Mondschein* of counsel), for appellant.

*Kreutzer, Heller, Selman & Galt (Benjamin Heller, S. Stanley Kreutzer* and *Martin H. Selman* of counsel), for respondent.

SHAPIRO, J. The appellant, First National City Bank, the coexecutor of the decedent's will, in this discovery proceeding sought to recover from the respondent, Doris Rosen (hereinafter called Doris), certain bearer bonds in the total principal

amount of approximately $115,000 and the proceeds of a joint savings account in the names of Doris and the decedent. I agree with the learned Surrogate's holding that upon the decedent's death Doris became the owner of the joint savings account as trustee for her daughter Helen, but I disagree with his determination that Doris established a valid gift of the bearer bonds.

The decedent died on February 15, 1968 at the age of approximately 92 years. He was a childless widower. Among his closest relatives were his niece, Fanny Spalten (Doris' mother — hereinafter referred to as Fanny), and her three children. He had purchased the bonds in question in 1962 or 1963. They remained in a safe-deposit box in Manhattan until 1966. After the death of the decedent's wife in 1965, he began to spend more time with his niece Fanny and with the respondent. He ultimately decided to help the Spaltens purchase a home in Brooklyn so that he could move in with them. He made them a gift of $10,000 toward the purchase (at the same time reducing the bequest to Fanny in his will from $15,000 to $5,000) and advanced another $26,000, for which he took back a note and mortgage. Title to the house was taken in the names of Fanny's three daughters.

The decedent moved to his new quarters in September, 1965. On April 14, 1966 he terminated his rental of the safe-deposit box in Manhattan and rented a safe-deposit box in a bank near his new home in Brooklyn in the joint names of himself and Doris. The bonds remained in that box until (together with the unmatured coupons) they were removed by Doris on the day after the decedent's death.

The decedent's will, which is dated February 27, 1967, established a residuary trust for the benefit of Yeshiva University for the purpose of establishing a scholarship for needy students.

Doris asserts title to the bonds by virtue of an *inter vivos* gift on April 14, 1966, the date upon which the bonds were transported to Brooklyn. Doris' parents, her husband and her husband's sister all testified that the decedent had loved Doris and her child and that he had told them that he had made a gift of the bonds to Doris. Doris' parents also testified that the decedent had informed them in advance of his intention to make such a gift.

Fanny testified that on April 14, 1966, by automobile, she accompanied the decedent and Doris to the vault in Manhattan, from which the bonds were withdrawn; that she waited in the car; and that when the decedent and Doris came out of the bank Doris was carrying the bonds and he told Fanny that he had given

the bonds to Doris because of his deep affection for her. *However, all of the testimony adduced on Doris' behalf was to the effect that the decedent retained the ownership of the coupons affixed to the bonds.*

Less than three weeks after making the purported gift, the decedent informed his attorney that gifts of certain jewelry, which were specifically bequeathed in his will, had already been made. At the attorney's suggestion, preparations were made for the drafting of a new will and at his request the decedent sent him a list of all gifts which he had made since 1962. Such a list was prepared by Doris' husband and typed by Doris herself. *It did not include the bonds.*

In January, 1967 the decedent told the general counsel of Yeshiva University that the bonds were in '' my vault in Brooklyn '' and clearly referred to them as though they were still his property.

The decedent always had a key to the safe-deposit box, paid the rental fees thereon and at all times collected all of the interest on the bonds.

One who attempts to establish title to property through a gift *inter vivos* as against a decedent's estate has a very heavy burden to sustain. The proof must be of great probative force and must clearly establish every element of a valid gift (*Matter of Kennedy,* 36 A D 2d 549; *Matter of Kaminsky,* 17 A D 2d 690). A decedent's statement that he has given property to a relative, when contradicted by the fact that he retains control over the property and continues to receive the income therefrom, is insufficient to provide clear and convincing proof of a gift, as there is in such a case no credible proof of delivery (*Matter of Gilman,* 92 Misc. 140, affd. 175 App. Div. 185, affd. 220 N. Y. 659). By that test, clear and convincing proof of a valid *inter vivos* gift is factually lacking in this case.

True it is that the element of delivery may be found, in certain cases, through transfer of property to a joint safe-deposit box (see, e.g., *Matter of Shine,* 4 A D 2d 1026; *Matter of Winsor,* 259 App. Div. 935). Those cases, however, unlike this one, involved no retention. by the decedent of any interest in the property and there the circumstances clearly established no reason for the utilization of a joint safe-deposit box save as a means of effecting a delivery of the property and hence the placing of the property into such a box was deemed to be a constructive delivery (see *Gilkinson* v. *Third Ave. R. R. Co.,* 47 App. Div. 472).

The facts in this case, however, afford no reason to depart from the usual rule that '' joint custody negatives any idea of a gift ''

(cf. *Matter of Kelly*, 285 N. Y. 139, 150), for the proof here that the decedent intended a gift is neither clear nor convincing. The decedent was in the habit of advising his attorney of his gifts and was most precise about his bequests, frequently drawing new wills and subscribing codicils thereto, in order to reflect changes in his estate far less substantial than those involved here. The record makes it crystal clear that the decedent was most meticulous about reducing his every act, intention and obligation to writing. Thus, when he moved to Brooklyn, he signed a lease with Doris and her sisters which required him to pay a rental of $100 a month; this was in addition to his paying $25 every two weeks for board. When he converted the individual savings account to a joint account with Doris, he signed a letter indicating that upon his demise the account was to be used "soley [*sic*] as a gift" for Doris' daughter; and when, as noted, he made a gift of $10,000 to Fanny toward the purchase of the home in Brooklyn, he reduced her bequest in the will by that amount. Similarly, when he advanced $26,000 toward the purchase of the home in Brooklyn, he took back a note and a mortgage. This most substantial purported gift of $115,000 in bonds, however, was not commemorated by any writing and was not included by the decedent on the list of gifts sent by him to his lawyer, even though it involved a major portion of his residuary estate; and what is of great significance is that this list was prepared by Doris' husband and typewritten by her.

It is argued that the renting of the joint safe-deposit box and the placing of the bonds therein point unequivocally to a gift, but this contention falls of its own weight when it is recalled that the decedent was approximately 90 years of age when that box was rented; that he could no longer get to the bank with ease in order to clip the coupons from his bonds; and that the use of a joint box was a mere convenience to enable Doris to obtain the coupons for him without requiring him to personally go to the bank. Upon the whole record, I find the facts to be more consistent with an intent on the part of the owner to continue to retain title to the bonds rather than with an intent to transfer ownership thereof.

The rule requiring proof of delivery is not changed by *Mutual Life Ins. Co. of N. Y.* v. *Holley* (280 N. Y. 330), for that case merely stands for the proposition that an actual delivery may be established, at least in part, by admissions of the donor. That rule establishes the admissibility of such declarations, but does not, per se, alter the requirement that a gift *inter vivos* may be sustained only by clear and convincing evidence. Here, factu-

ally, I believe that the Surrogate's findings as to the declarations made by the decedent are contrary to the weight of the evidence.

In my opinion *Young* v. *Young* (80 N. Y. 422) is determinative of the issues here. The question there was whether there was sufficient proof of a delivery of coupon bonds to sustain a finding of a gift. The court examined the facts with an admittedly strong disposition to sustain a gift, as the decedent's intention to make such a gift (unlike the facts in the instant case) was most clearly manifested, but it was unable to reach its desired result, saying (pp. 430–431): "To establish a valid gift, a delivery of the subject of the gift to the donee or to some person for him, so as to divest the possession and title of the donor, must be shown, and the first question which arises under the peculiar circumstances of this case is, whether it is practicable to make a valid gift *in præsenti* of an instrument securing the payment of money, reserving to the donor the accruing interest, and, if so, by what means this can be done. The purpose of such a gift may undoubtedly be accomplished by a proper transfer to a trustee and perhaps by a written transfer delivered to the donee, but the question now is, can it be done in the form of a gift, without any written transfer delivered to the donee, and without creating any trust. *I can conceive of but one way in which this is possible, and that is by an absolute delivery of the security which is the subject of the gift, to the donee, vesting the entire legal title and possession in him, on his undertaking to account to the donor for the interest which he may collect thereon. But if the donor retains the instrument under his own control, though he do so merely for the purpose of collecting the interest, there is an absence of the complete delivery which is absolutely essential to the validity of a gift.* A gift cannot be made by creating a joint possession of donor and donee, even though the intention be that each shall have an interest in the chattel, especially where, as in this case, the line of division between these interests is not ascertainable. The reservation of the interest on the bonds to the donor was for an uncertain period, that is during his life-time, and until his death it was impossible to determine the precise proportion of the money secured by the bonds, to which the donee was entitled.

"*If therefore the donor retained the custody of the bonds for the purpose of collecting the accruing interest, or even if they were placed in the joint custody or possession of himself and the donee, there was no sufficient delivery to constitute a gift.* But if an absolute delivery of the bonds to the donee, with intent to pass the title, was made out, the donor reserving only the right

to look to the donee for the interest, the transaction may be sustained as an executed gift. (*Doty* v. *Willson,* 47 N. Y. 580.) '' (Emphasis supplied.)

Noting that the decedent had, in certain memoranda, retained the right to the interest on the bonds for his life after in effect placing them in joint custody with his sons, the court stated (pp. 434–436): '' The possession of these coupons was necessary to enable him to collect the interest, and he availed himself of it for that purpose from time to time. No intention was manifested to deliver up these vouchers, and look to the donees for the interest. No division of the coupons could be made, for the period of the donor's life was uncertain; and further, if all the coupons were retained by the donor, they might not represent the entire interest reserved by him. The bonds matured in 1887 and 1888, and some were redeemable earlier; and if he had lived until the maturity of the bonds, or until the United States bonds were called in by the government, as they were liable to be, the donees would not then have been entitled to the possession of the bonds or their proceeds. The reservation accompanying the gift would entitle the donor to possession of the fund. *The intention of the donor,* as deducible from the memoranda and the evidence, was, not to part with his title to the accruing interest, but to keep the bonds and collect the interest for his own use till he should die; and that then, and not before, his sons should have possession of them and own them absolutely. *That although he meant that their right to this interest in remainder should be vested and irrevocable from the time of the supposed gift, yet that at no time during his life did the donees have exclusive possession of the bonds or the legal right to such possession.*

'' The declarations of the donor that he had given the bonds to his sons, must be understood as referring to the qualified gift which he intended to make. *There is nothing to indicate that he ever relinquished his right to the interest,* and all the circumstances of the case show that he could not have intended to admit that he had made an absolute gift, free from the qualification expressed in the memoranda.

\* \* \*

'' It is impossible to sustain this as an executed gift, without abrogating the rule that delivery is essential to gifts of chattels *inter vivos.* It is an elementary rule that such a gift cannot be made to take effect in possession *in futuro.* Such a transaction amounts only to a promise to make a gift, which is *nudum pactum.* (*Pitts* v. *Mangum,* 2 Bailey S. C. 588). There must be

a delivery of possession with a view to pass a present right of property. 'Any gift of chattels which expressly reserves the use of the property to the donor for a certain period, or (as commonly appears in the cases which the courts have had occasion to pass upon) as long as the donor shall live, is ineffectual.' (Schouler on Pers. Prop., vol. 2, p. 118, and cases cited; *Vass* v. *Hicks*, 3 Murphy [N. C.] 494.) This rule has been applied even where the gift was made by a written instrument or deed purporting to transfer the title, but containing the reservation" (emphasis supplied).

In *Young* the court was unable to make a finding that there had been a valid gift despite its desire so to do because of the factual pattern evidencing clear proof of an intention to make such a gift. In this, a much weaker case, I can find no completed gift, even if I were inclined to accept as credible the proof offered on Doris' behalf of the decedent's intention to make such a gift, since "the donor retained the custody of the bonds for the purpose of collecting the accruing interest" and that is so "even if they were placed in the joint custody or possession of himself and the donee" (*Young* v. *Young, supra,* p. 431). Hence, at best, there is a showing in this record of nothing more than an unenforceable promise to make a gift.

In view of the lack of clear and convincing evidence of donative intent, the ambiguous effect of the joint custody and the conceded right of the donor, after the purported delivery, to continue to collect on the coupons attached to the bonds, the decree appealed from should be modified, on the law and facts, by deleting therefrom subdivision (1) of the first decretal paragraph thereof and by substituting therefor a provision directing the respondent to deliver the securities described therein, and the coupons attached thereto at the time of the decedent's death, or the value thereof*, to the appellant; and, as so modified, should be affirmed insofar as appealed from, with costs to appellant and respondent, payable out of the estate.

MUNDER, Acting P. J., and BENJAMIN, J., concur; MARTUSCELLO and BRENNAN, JJ., dissent and vote to affirm the decree insofar as appealed from.

Decree modified, on the law and the facts, by deleting subdivision (1) of the first decretal paragraph thereof and by substituting therefor a provision directing the respondent to deliver

---

* Upon the argument of the appeal the attorneys for the respondent conceded that one day after the testator's death the respondent took possession not only of the bonds but of the coupons still attached thereto.

the securities described therein, and the coupons attached thereto at the time of the decedent's death, or the value thereof, to the appellant. As so modified, decree affirmed insofar as appealed from, with costs to appellant and respondent, payable out of the estate.