THE ESTATE OF F. Adele WOOTERS, by and through its co-personal representatives, Ruth KLEIN and Janice W. Bruce, Individually and in their capacities as Distributees of the Estate of Armand Braiger, Ruth Klein, Individually, and Leonore Spinell, Individually and in her capacity as Distributee of the Estate of Armand Braiger, Plaintiffs,

v.

Noury GOUJJANE, Individually and in his capacity as Preliminary Executor of the Estate of Armand Braiger, Roseanne Manetta, Rapa Nui, Inc., Rapa Nui Realty, Corp., and Teloca Realty, Corp., Defendants.

No. 02 Civ. 9734(SAS).

United States District Court, S.D. New York.

Oct. 2, 2003.

Kevin T. Mulhearn, Kevin T. Mulhearn, P.C., Orangeburg, New York City, for Plaintiffs.

Donald Novick, Schwartzapfel, Novick, Truhowsky & Marcus, P.C., Huntington, New York, for Defendants.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

This action is brought by distributees of an estate who allege that the preliminary executor of the estate fraudulently transferred and converted stock shares in three closely held corporations, thereby depleting the estate's assets. Plaintiffs are the Estate of F. Adele Wooters ("Wooters Estate") by its representatives Ruth Klein and Janice W. Bruce, Ruth Klein, and Leonore Spinell (collectively, "plaintiffs"). Defendants are Noury Goujjane, Roseanne Manetta, and Rapa Nui, Inc. ("Rapa"), Rapa Nui Realty, Corp. ("Rapa Realty"), and Teloca Realty Corp. ("Teloca") (collectively, "defendants"). This Court's jurisdiction is based on plaintiffs' claim that defendants have violated 18 U.S.C. § 1961 et seq., the Racketeer Influenced and Corrupt Organizations Act, and that consequently, they are entitled to civil damages under 18 U.S.C. § 1964(c). Plaintiffs also assert state law claims for common law fraud and conversion, invoking the Court's supplemental jurisdiction under 28 U.S.C. § 1367. A bench trial was held on September 23–24, 2003. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court makes the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

### A. Background

Armand Braiger, Leonore Spinell and F. Adele Wooters were siblings. Braiger was the co-founder and proprietor of the landmark restaurant, "One If By Land, Two If By Sea" ("the restaurant"), located at 17 Barrow Street in New York. Braiger died on August 20, 1999. F. Adele Wooters died on October 20, 1999. Wooters is survived by her two children, Ruth Klein and Janice W. Bruce, who serve as the co-personal representatives of the Wooters Estate. Spinell is Braiger's sole surviving sibling. The Wooters Estate and Spinell are distributees of the Braiger Estate.

Rapa Realty is the title owner of 17 Barrow Street, and Teloca is the title owner of 19–21 Barrow Street. At the time of Braiger's death, Teloca was also the title owner of unit 1405 in Mystic Point Tower in Aventura, Florida. Teloca has since sold that condominium unit for approximately $117,000.[1]

Goujjane is the preliminary executor of the Braiger Estate and, pursuant to Braiger's will, the largest beneficiary of the estate. However, because Braiger's will is the subject of a contested probate proceeding, it has not been admitted to probate, Goujjane has not been named executor, and the estate's assets have not been distributed.

### B. Goujjane's and Braiger's Relationship

Goujjane met Braiger in 1992 and shortly thereafter became employed by Rapa, the corporate and business entity for the restaurant. The two men had a very close personal relationship. They spoke on a daily basis, and when Braiger was in New York, they saw each other daily. Braiger and Goujjane bought property together in New York and Florida, and their families spent holidays together.

Braiger trusted Goujjane both with his business and his health. To that end, in July 1999, Braiger executed a durable power of attorney that authorized Goujjane to act on Braiger's behalf in business and personal matters. Also in July 1999, Braiger executed a health care proxy that authorized Goujjane to make health care decisions for Braiger in the event that Braiger became incapacitated. Although Braiger and Goujjane were not related biologically, the bond between them was stronger than that between Braiger and his family.

As early as 1995, Braiger expressed his desire to have Goujjane succeed him as owner of the restaurant. Accordingly, Braiger executed a will that left his shares of Rapa, Rapa Realty and Teloca to Goujjane. Notably, Braiger's will designated Goujjane as the beneficiary of nearly all of Braiger's estate, and, in the event that Goujjane predeceased Braiger, Goujjane's children were to be the beneficiaries. Braiger also provided for Goujjane through an irrevocable trust that was executed in December 1995. The trust afforded substantial benefits to Goujjane both during Braiger's lifetime and after his death.

Braiger told lawyers, friends and employees that after he died, he wanted Goujjane to take over the restaurant. In 1998, he transferred 10 percent of the shares of Rapa to himself and Goujjane as joint tenants with the right of survivorship. Before his death, Braiger met with an attorney and took steps to transfer the

---

1. The condo was the subject of an action before the Circuit Court for Miami–Dade County. *See Teloca Realty Inc. v. Ruth Klein and Unknown Occupant,* No. 00–8915 CA32 (Fl.Cir.Ct.2001).

remaining 90 percent of Rapa's shares to himself and Goujjane as joint tenants with the right of survivorship. Specifically, on July 26, 1999, Braiger, through an attorney, submitted a corporate change application for Rapa to the New York State Liquor Authority, stating that he was seeking to transfer his remaining shares of Rapa to himself and Goujjane as joint tenants, and that the transfer constituted a gift without consideration.[2] The Court has no doubt that before his death, Braiger wanted all of Rapa's shares to be owned by Braiger and Goujjane jointly with the right of survivorship, and that upon his death, Braiger wanted Goujjane to own all of the shares of Rapa Realty and Teloca.

## C. Braiger's Declining Health

In May 1999, Braiger, who was then 68 years old, was hospitalized in Florida for diverticulitis. Subsequent testing showed that Braiger's arteries were blocked, and he underwent bypass surgery. Though he remained hospitalized until his death on August 20, 1999, his condition was not considered life-threatening until the four days preceding his death.

While in the hospital, Braiger made daily telephone calls to Goujjane and Manetta, the restaurant's general manager, and both Goujjane and Manetta traveled from New York to Florida to visit him. Braiger continued to participate in the affairs of the restaurant and deal with his personal matters. Thus, during his hospital stay, Braiger met with attorneys and executed both the durable power of attorney and the health care proxy.

## D. The Corporate Stock Transfers

As of August 3, 1999, Braiger owned all 100 issued stock shares of Rapa Realty, all 20,000 issued stock shares of Teloca, and 180 shares of Rapa's 200 issued shares. The remaining 20 shares of Rapa were owned by Goujjane and Braiger as joint tenants with the right of survivorship pursuant to a transfer that was effected on November 23, 1998.

On August 4, 1999, during his hospitalization, Braiger had several telephone conversations with Manetta and Goujjane, who were at the restaurant in New York. Sometime after the August 4 telephone conversations, Manetta drafted corporate minutes for Rapa, stating that (1) on August 4, 1999, the corporate books were in the custody of attorney Mark Glick; (2) Braiger and Goujjane had offered to surrender their respective shares of Rapa; and (3) all 200 shares would be reissued to Braiger and Goujjane as joint tenants with the right of survivorship. Also sometime after the August 4 conversations, new stock certificates were issued for Teloca, Rapa and Rapa Realty. The new certificates were all dated August 4, 1999, and identified the registered holders of the stock as Braiger and Goujjane, joint tenants with the right of survivorship.[3] Defendants concede that the certificate for Rapa was not issued on August 4, 1999, but was issued on a later date and backdated. The Court makes no finding with respect to whether the certificates for Teloca and Rapa Realty also were backdated.

Although Goujjane and Manetta visited Braiger in the hospital after August 4,

<hr>

**2.** Pursuant to a May 26, 1999 letter from Braiger to Goujjane, the gift was contingent upon approval by the State Liquor Authority. Because that approval was not obtained until after Braiger's death, the gift was never consummated.

**3.** Goujjane derived his authority to act on Braiger's behalf with respect to these stock transfers from the July, 1999, power of attorney.

1999, they did not bring him any documents related to the stock transfers, and Braiger himself never signed any documents related to the transfers. Moreover, Goujjane and Manetta did not discuss the transfers with any of Braiger's attorneys until after Braiger's death, and there is no evidence that Braiger discussed the transfers with any of his attorneys while he was hospitalized.

## III. CONCLUSIONS OF LAW

### A. Applicable Legal Standards

#### 1. Inter Vivos Gifts

 Under New York law, which the parties agree governs the state claims, there are three requirements for a valid inter vivos gift: (1) intent on the part of a donor to give; (2) delivery of the property given pursuant to such an intent; and (3) acceptance on the part of the donee. *See Matter of Szabo*, 10 N.Y.2d 94, 98, 217 N.Y.S.2d 593, 176 N.E.2d 395 (1961). The second element, delivery, requires a "change of dominion and ownership; intention or mere words cannot supply the place of an actual surrender of control and authority." *Id.* (quoting *Vincent v. Rix*, 248 N.Y. 76, 83, 161 N.E. 425 (1928)). Where stock certificates are the subject of the gift, a symbolic delivery is sufficient if it is the only type of delivery that is practicable, but even a symbolic delivery "must proceed to a point of no return, and this can only be reached when there is a transfer of record on the stock books of the company." *Szabo*, 10 N.Y.2d at 98, 217 N.Y.S.2d 593, 176 N.E.2d 395.

 "The proponent of a gift has the burden of proving each of [the elements of an inter vivos gift] by clear and convincing evidence." *Gruen v. Gruen*, 68 N.Y.2d 48, 53, 505 N.Y.S.2d 849, 496 N.E.2d 869 (1986) (citing *Matter of Kelly*, 285 N.Y. 139, 150, 33 N.E.2d 62 (1941) and *Matter*

*of Abramowitz*, 38 A.D.2d 387, 389–90, 329 N.Y.S.2d 932 (2d Dep't 1972)). Moreover, where an agent makes an inter vivos gift to himself on behalf of the principal, the agent-donee has an additional burden because gifts by an agent to himself carry a presumption of impropriety and self-dealing. *See In re Estate of Naumoff*, 301 A.D.2d 802, 803, 754 N.Y.S.2d 70 (3d Dep't 2003); *Semmler v. Naples*, 166 A.D.2d 751, 752, 563 N.Y.S.2d 116 (3d Dep't 1990). The presumption can be overcome only with the "clearest showing of intent on the part of the principal to make the gift." *Matter of Estate of De Belardino*, 77 Misc.2d 253, 352 N.Y.S.2d 858, 863 (Sur. Ct. Monroe Co.1974). *See also Naumoff*, 301 A.D.2d at 803, 754 N.Y.S.2d 70; *Semmler*, 166 A.D.2d at 752, 563 N.Y.S.2d 116.

#### 2. Common Law Fraud

 Under New York law, a plaintiff seeking to prove fraud must show "representation of a material existing fact, falsity, scienter, deception, and injury." *Manning v. Utilities Mutual Ins. Co. Inc.*, 254 F.3d 387, 400 (2d Cir.2001) (citing *New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 639 N.Y.S.2d 283, 289, 662 N.E.2d 763 (1995)). Moreover, the plaintiff must establish all of these elements by clear and convincing evidence. *See Kaye v. Grossman*, 202 F.3d 611, 614 (2d Cir. 2000); *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir.1997).

#### 3. Conversion

 Under New York law, a plaintiff claiming conversion must prove that the defendant "deni[ed] or violat[ed] the plaintiff's dominion, rights, or possession" of property. *In re Chateaugay Corp.*, 10 F.3d 944, 957 (2d Cir.1993) (quoting *Sporn v. MCA Records, Inc.*, 58 N.Y.2d 482, 487, 462 N.Y.S.2d 413, 448 N.E.2d 1324 (1983)). The plaintiff must establish the conversion

by a preponderance of the evidence. *See Leucadia, Inc. v. Reliance Ins. Co.,* 864 F.2d 964, 971–72 (2d Cir.1988) (citing *Aetna Cas. & Sur. Co. v. Glass,* 75 A.D.2d 786, 428 N.Y.S.2d 246, 247 (1st Dep't 1980)).

### 4. Civil RICO

▮ To establish a civil RICO claim pursuant to 18 U.S.C. § 1964(c), a plaintiff must prove an injury resulting from "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 491, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). Violations of the mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343, the Hobbs Act, 18 U.S.C. § 1951, and 18 U.S.C. § 2314 regarding transportation of stolen monies, all constitute "racketeering activity." *See* 18 U.S.C. § 1961.

▮ Where a plaintiff claims mail and/or wire fraud under 18 U.S.C. §§ 1341, 1343 as predicate acts to a civil RICO claim, the plaintiff must show (1) the existence of a scheme to defraud, (2) the defendant's knowing participation in the scheme, and (3) the use of the wires and/or mails in interstate commerce in furtherance of the scheme. *See Chanayil v. Gulati,* 169 F.3d 168, 170–71 (2d Cir.1999). These elements must be established by a preponderance of the evidence. *See Sedima,* 473 U.S. at 491, 105 S.Ct. 3275; *Durante Bros., and Sons Inc. v. Flushing Nat'l Bank,* 755 F.2d 239, 247 (2d Cir. 1985); *Rodonich v. House Wreckers Union, Local 95 of Laborers' Intern. Union of North America,* 627 F.Supp. 176, 178 (S.D.N.Y.1985).

▮ A plaintiff claiming a Hobbs Act violation, 18 U.S.C. § 1951, as a predicate act in a civil RICO claim must establish that the defendant "obstruct[ed], delay[ed], or affect[ed] commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempt[ed] or conspire[d] so to do, or commit[ted] or threaten[ed] physical violence to any person or property in furtherance of a plan or purpose to do [so]." 18 U.S.C. § 1951. *See also McLaughlin v. Anderson,* 962 F.2d 187 (2d Cir.1992). The plaintiff must establish the Hobbs Act violation by a preponderance of the evidence. *See Sedima,* 473 U.S. at 491, 105 S.Ct. 3275; *Durante Bros.,* 755 F.2d at 247; *Rodonich,* 627 F.Supp. at 178.

▮ Finally, a plaintiff claiming transportation of stolen monies, as defined by 18 U.S.C. § 2314, as a predicate act for a civil RICO claim, must establish that the defendant devised a scheme to defraud or to obtain money by false or fraudulent purposes, and in connection with that scheme, transported money or property having a value of $5,000 or more in interstate or foreign commerce. *See* 18 U.S.C. § 2314. The plaintiff must prove transportation of stolen monies by a preponderance of the evidence. *See Sedima,* 473 U.S. at 491, 105 S.Ct. 3275; *Durante Bros.,* 755 F.2d at 247; *Rodonich,* 627 F.Supp. at 178.

### B. Discussion

Unlike in most civil cases, both parties here carry a substantial burden—in order to prevail on their fraud claim, plaintiffs must prove the elements of fraud by clear and convincing evidence, and to prevail on their conversion and/or civil RICO claims, plaintiffs must establish the elements by a preponderance of the evidence. However, because plaintiffs challenge the validity of the August 4, 1999 stock transfers, even if they fail to prove their claims, defendant Goujjane does not necessarily prevail. He still must prove by clear and convincing evidence that the August 4, 1999 stock transfers constituted a valid inter vivos gift. I conclude that neither party has met its respective burden.

### 1. Plaintiffs' Burden

■ Plaintiffs have not proved that Goujjane and Manetta engaged in a scheme to defraud when they transferred Braiger's stock to Braiger and Goujjane as joint tenants. Both fraud and conversion require proof of intent. Defendants testified that they executed the stock transfers at Braiger's request, and plaintiffs were unable to refute this testimony. Although plaintiffs have raised some question as to whether Braiger directed Goujjane and Manetta to make the transfers during the August 4, 1999 conversation, these doubts do not rise to the level of proving fraud by a preponderance of the evidence. All of the evidence indicates that Braiger *wanted* Goujjane to take all of the corporate stock upon his death, and repeatedly communicated this wish to Goujjane. Under these circumstances, the Court is not convinced that Goujjane and Manetta had the requisite scienter, even if the telephone conversation did not occur exactly as described. Plaintiffs have simply failed to prove that the defendants *intended* to defraud Braiger's estate, much less engaged in a racketeering enterprise.

### 2. Defendant Goujjane's Burden

■ On the other hand, Goujjane has not established by clear and convincing evidence that the transfers were valid inter vivos gifts. Because Braiger is deceased, it is impossible to confirm the substance of the August 4, 1999 telephone conversations. The only evidence in the record that Braiger intended to make a gift to Goujjane of all of the stock on August 4, 1999 is the testimony of Goujjane and Manetta. However, as the recipient of the gift, Goujjane is obviously an interested witness, as is Manetta because she is Goujjane's employee and the manager of the restaurant that he owns. I allowed defendants to testify to the contents of the August 4 conversations despite their being interested witnesses because plaintiffs waived their objection to such testimony.[4] But as I noted during trial, the Second Circuit has suggested that where an interested person testifies in a bench trial regarding statements of a deceased person, the testimony should be admitted, but the Court should weight it accordingly. *See Brand v. Brand*, 811 F.2d 74, 79 (2d Cir.1987). Thus, given that both Goujjane and Manetta have a substantial interest in the outcome of this litigation, in the absence of any corroborating evidence, their testimony cannot rise to the level of the "clearest showing of intent on the part of the principal to make the gift," *Matter of Estate of De Belardino*, 352 N.Y.S.2d at 863.

Moreover, certain aspects of Manetta's testimony undermine her credibility. Spe-

---

4. Plaintiffs argued that the testimony was barred by the Dead Man's Statute. Dead Man's statutes typically prohibit an interested witness from testifying to statements of a deceased person where the witness stands to benefit from that testimony. Although the Federal Rules of Evidence do not include a Dead Man's statute, such statutes are applicable to state law claims pending in federal court because the statutes address witness competency. *See* Fed.R.Evid. 601. There is some question, however, with respect to whether a Dead Man's statute would be applicable to actions such as this one, where there are some state law claims and some federal claims. To allow the testimony for the state law claims, but prohibit it for the federal claims, would create considerable tension where, as here, the claims overlap. This tension is exacerbated in the present case by the fact that Rule 803(3) of the Federal Rules of Evidence appears to allow the disputed testimony, at least with respect to the federal claims. *See* Fed.R.Evid. 803(3); *Saltzman v. Comm. of Internal Revenue*, 131 F.3d 87, 94 (2d Cir.1997). Although these issues create interesting legal questions, the Court need not reach them at this time because the plaintiffs waived their objection to the testimony.

cifically, Manetta testified at one of her depositions that on August 4, 1999, neither she nor Goujjane knew where Rapa's corporate books were located. She also testified, both during the deposition and at trial, that she drafted corporate minutes for Rapa on August 4, 1999. Those corporate minutes, however, state that Rapa's books and records were in the custody of attorney Glick. When questioned at trial about this apparent inconsistency, Manetta testified she knew on August 4, 1999, that the Rapa records were with Glick, and stated that her deposition testimony was erroneous.

Similarly, Manetta's testimony regarding the August 4, 1999 Rapa corporate minutes is inconsistent. The language Manetta employed in drafting the minutes is wrought with legalese. At her deposition, Manetta testified that she copied the language from minutes she found in either Rapa Realty's or Teloca's books and records. However, neither Rapa Realty's nor Teloca's books contain minutes or documents employing such language. When asked to explain this inconsistency at trial, Manetta changed her testimony and stated that she copied the language from earlier Rapa corporate minutes that she found misfiled in either Teloca's or Rapa Realty's books. Manetta again stated that her deposition testimony was erroneous.

Furthermore, Manetta acknowledges that the new stock certificate for Rapa was not issued on August 4, 1999, and instead was backdated to reflect that date. She cannot recall the actual date that the certificate was issued, but she is certain that she did the backdating before Braiger's death. Because Manetta testified that she was very busy between August 4, 1999, and Braiger's death on August 20, 1999, and was not focused on the stock transfers, the Court has some doubt as to whether Manetta actually issued the Rapa certificate during this period. Moreover, the backdating itself, regardless of when it was done, is troubling.

Finally, Braiger was a sophisticated businessman who, at least until August 4, 1999, always used lawyers when engaging in legal transactions. For example, in the early 1990s, before he met Goujjane, Braiger employed attorney Glick to transfer corporate stock to himself and his now-deceased partner, Mario DeMartini, as joint tenants with the right of survivorship. When Braiger wished to add Goujjane to the restaurant's liquor license in 1997, he employed attorney Warren Pesetsky to advise him and effectuate the transaction. In connection with the liquor license change, Braiger employed Glick to transfer 10 percent of Rapa's stock to himself and Goujjane as joint tenants, and to prepare the corresponding corporate minutes. Before his hospitalization, Braiger contacted Pesetsky regarding transferring his remaining interest in Rapa to himself and Goujjane as joint tenants. Braiger also used a lawyer, Warren Sammut, to draft his will and the irrevocable trust, and when Braiger contemplated making changes to the will, he contacted Sammut and informed him that he planned to use a Florida attorney to make the changes. Even when Braiger was in the hospital in July of 1999, he relied on lawyers to draft the durable power of attorney and the health care proxy.

Given that Braiger consistently employed attorneys for assistance in legal transactions, it is curious that in August 1999, he did not notify any of his attorneys of his desire to transfer all of his corporate interests to himself and Goujjane jointly, let alone employ an attorney to effectuate the transfer. This aberration is particularly troubling given that, at the time of the purported telephone instructions to Goujjane and Manetta, Braiger was not dying—he was actively participating in the

business affairs of the restaurant from his hospital bed, and was expected to make a full recovery.

In sum, Goujjane has not established by *clear and convincing evidence* that on August 4, 1999, Braiger intended to make an inter vivos gift to Goujjane. Both Goujjane's and Manetta's testimony are undermined by their substantial interests in the outcome of this action. Furthermore, Manetta's testimony was inconsistent in some key respects, and Braiger's purported actions on August 4, 1999, are not consistent with his past behavior. Under the circumstances, Goujjane has failed to make the "clearest showing of intent on the part of [Braiger] to make the gift." *Matter of Estate of De Belardino*, 352 N.Y.S.2d at 863. Though the Court has no doubt that Braiger intended for Goujjane to receive the stock eventually, it has some doubt with respect to whether Braiger intended to make the gift on August 4, 1999, or whether Goujjane engaged in self-help out of some concern that Braiger's general intent would not be carried out after his death. Because I conclude that Goujjane has failed to establish intent to effectuate the transfer as of August 4, 1999, I need not reach the issues of delivery and acceptance.

## IV. CONCLUSION

For the foregoing reasons, judgment is for the defendants on plaintiffs' allegations of fraud, conversion and civil RICO. However, because defendant Goujjane has failed to sufficiently establish a valid inter vivos gift, all of the shares of Teloca and Rapa Realty, and 180 of the shares of Rapa, must be returned to Braiger's estate.

SO ORDERED.