[888 NYS2d 714]

EMPIRE ONE TELECOMMUNICATIONS, INC., Plaintiff, v VERIZON NEW YORK, INC., Defendant.

Supreme Court, Kings County, October 22, 2009

542

544

**APPEARANCES OF COUNSEL**

*Schlam Stone & Dolan, LLP*, New York City (*Andrew S. Harris* of counsel), for defendant. *Goldberg & Rimberg, PLLC*, New York City (*Steven A. Weg* of counsel), for plaintiff.

**OPINION OF THE COURT**

CAROLYN E. DEMAREST, J.

In this action by plaintiff Empire One Telecommunications, Inc. alleging, inter alia, breach of an interconnection agreement, defendant Verizon New York, Inc. moves, pursuant to CPLR 3211 (a) (7), for an order dismissing the second, third, fourth, fifth, sixth, and ninth causes of action of Empire's complaint, and dismissing Empire's first cause of action and all other claims in Empire's complaint to the extent that they seek consequential damages.

## Background

Empire is a certified facilities based, competitive local exchange carrier (CLEC) with a valid certificate of public convenience and necessity filed with the New York State Public Service Commission (PSC) (*see* 47 USC § 153 [26]). Empire has approximately 10,000 customers to whom it provides telecommunications services. Verizon is an incumbent local exchange carrier (ILEC), which also provides telecommunications services (*see* 47 USC § 251 [h]). The two service providers are connected through a transmission network which is apparently controlled by Verizon by virtue of its ownership of the physical equipment. Empire has the right to charge Verizon and all other similarly connected telecommunications carriers (other CLECs, long-distance companies, and commercial cellular radiotelephone service providers) for calls originating from other carriers' customers that terminate with Empire's customers. It also pays Verizon a fee for the use of its equipment.

Under the Telecommunications Act of 1996 (47 USC § 151 *et seq.*), Verizon became obligated to provide certain telecommunications services to CLECs like Empire, allowing Empire to interconnect its network with Verizon's network. Verizon is required by statute to connect calls from interconnecting carriers to Empire. When a customer of another interconnecting carrier dials a telephone call to an Empire customer, the telephone call goes into a Verizon exchange that routes it to Empire's hub so that the call can reach its final destination at Empire's customer. Since the telephone call terminates at an Empire customer, Empire is entitled to bill the interconnecting carrier for routing the call through Empire's network. The amount Empire bills the interconnecting carrier depends on the nature of the call, with long-distance calls costing more than local calls. The equipment of the interconnecting carrier "talks" with the equipment at Verizon, thus enabling Verizon to determine the originating caller's number, and the destination and time of the call.

Effective August 21, 2001, Verizon and Empire entered into an interconnection agreement (interconnection agreement) providing for the interconnection of their networks in the State of New York pursuant to the Telecommunications Act of 1996 (47 USC § 151 *et seq.*). This was accomplished by Empire's exercise of its rights under a provision of the Telecommunications Act of 1996 (*see* 47 USC § 252 [i]) which permitted it to adopt or opt into an existing interconnection agreement between Verizon and another CLEC, Sprint Communications Company L.P., which had already been approved by the Public Service Commission. In accepting Empire's election, Verizon noted that no negotiation of any kind occurred between Empire and Verizon in concluding the contractual relationship between them.

Section 1.0 (b) of the interconnection agreement incorporates by reference Verizon's tariffs, filed with the applicable regulatory agencies, pursuant to the Communications Act of 1934 (47 USC § 151 *et seq.*, as amended), that govern its provision of services and facilities. One of the incorporated tariffs is Verizon's PSC NY Tariff No. 8 (Tariff No. 8), which provides pricing and other terms for Verizon's providing call records to Empire.

Section 7.1.7 (C) of Tariff No. 8 states:

"1. The Telephone Company [Verizon] will provide recording service in association with TSA [the telecommunications service agreement] when it

provides SSP functions to the CLEC or makes terminating access records. Recording service includes recording of call details, assembly, editing, formatting, and sorting of detailed call records and transmission of these call records to the CLEC in the standard industry format via first class US mail, by magnetic tape or other suitable transmission medium mutually agreed to by the CLEC and the Telephone Company [Verizon].

"2. The Telephone Company [Verizon] will provide ongoing support to the CLEC in investigating claims or reconciling recorded information in routine record tracking."

Part V, section 4.2.2 of the interconnection agreement specifies that Verizon will provide Empire with call records formatted in industry standard exchange message interface form. Section 36.6.2 of Tariff No. 8 provides that Verizon will charge Empire $0.0102 for each call record provided. Call records are created from Verizon's centralized automatic message accounting and database information. Empire alleges that these call records are essential to determining the jurisdiction (i.e., intrastate, interstate, intra-LATA [local], inter-LATA [long distance]) of calls originated by customers of other carriers that transit its network so that it can invoice these carriers.

The call records that Empire receives list three types of carriers: (1) long-distance carriers, (2) other CLECs, and (3) mobile carriers. In order to invoice the correct carrier, the call records must include certain information, including, but not limited to: the date and time of call, the originating telephone number in NPA form,[1] the terminating telephone number in NPA form, the duration of the call, a valid "LATA identifier," a valid settlement code, a valid originating local routing number, a valid "OCN" (for intra-LATA calls), and a valid "CIC" (for inter-LATA calls).

Empire alleges that Verizon has manipulated the call records supplied to it by replacing some of the information it receives from other CLECs and wireless carriers with information that renders the call records useless for the very purpose for which they are intended. Specifically, Empire claims that between 20% and 35% of the call records it received from Verizon contain the following invalid information: (1) the originating telephone

---

1. NPA refers to the numbering plan area, commonly known as an area code.

number appears as "000-000-0000" instead of NPA-NXX-XXXX; (2) the field for "Indicator 19," a field known as the LATA identifier, contains a value of "9," which indicates "not determined," when it should contain a value of "1" through "8"; and (3) the settlement code contains a value of "Z," which indicates that the settlement code could not be identified. Empire asserts that the omission of this information has prevented it from determining the originating jurisdiction or types of telephone calls, and has precluded it from charging the originating carrier for the services provided by Empire. Empire claims that Verizon is capable of including all of the information necessary to properly invoice these other carriers, but Verizon has refused Empire's requests to provide complete and adequate call records.

From January through November 2008, Empire paid Verizon $824,293.49 for 90,813,087 call records. Empire estimates that 15,646,238 of these call records were invalid due to Verizon's failure to provide adequate call information. Thus, Empire has paid Verizon $159,622.24 for 15,646,238 allegedly invalid call records and was unable to bill other originating carriers for the calls reflected in the invalid call records supplied. Empire claims that it has lost at least $2,500,000 in revenue between 2004 and 2008, including approximately $1,311,203.61 since 2007, as a result of the invalid call records provided by Verizon.

Empire's complaint alleges nine causes of action. Empire's first cause of action for breach of contract alleges that Verizon has breached the interconnection agreement and Tariff No. 8 incorporated therein. Specifically, Empire asserts that instead of providing call details and the promised ongoing support to investigate or reconcile recorded information as Verizon is required to do under Tariff No. 8 § 7.1.7, Verizon has deliberately manipulated the call records and/or negligently failed to include the information necessary for it to invoice other carriers.

Empire's second, third, fourth, fifth and sixth causes of action for tortious interference with business relationship, gross negligence, fraud, breach of the implied covenant of good faith and fair dealing, and negligent misrepresentation, respectively, seek damages in an amount to be determined at trial, but in no event less than $2,500,000, together with interest thereon.

Empire's seventh and eighth causes of action for unjust enrichment and failure to pay for goods and services delivered, respectively, allege that Verizon failed to pay for services provided by Empire in allowing the telephone calls which

originated with Verizon's customers and terminated at Empire's customers to transit Empire's network. Each of these causes of action seeks $62,307.77 as payment for these services rendered to Verizon. Empire's ninth cause of action alleges a claim of prima facie tort and seeks damages in an amount to be determined at trial, but in no event less than $1,000,000.

Verizon does not seek dismissal of Empire's seventh and eighth causes of action, but seeks dismissal of Empire's second, third, fourth, fifth, sixth, and ninth causes of action for failure to state a claim pursuant to CPLR 3211 (a) (7). Verizon also seeks dismissal of Empire's first cause of action and all other claims to the extent that "consequential damages" are demanded.

## Discussion
### The Challenge to Verizon's Evidence

Empire's contention that the court should disregard Verizon's arguments referring to the interconnection agreement and Tariff No. 8 because these documents are inadmissible as evidence due to Verizon's failure, in its moving papers, to provide an affidavit from someone with personal knowledge is wholly devoid of merit. The interconnection agreement and Tariff No. 8 are referred to, and form the basis for, the claims alleged against Verizon in Empire's complaint. Empire does not assert that the copies of the interconnection agreement or Tariff No. 8 submitted by Verizon are inauthentic or contain any inaccuracies. Moreover, the copy of Tariff No. 8 submitted by Verizon is admissible pursuant to CPLR 4540 (d) (*see Newman v Consolidated Edison Co.*, 79 Misc 2d 153, 154 [App Term, 2d Dept 1973]). In any case, Verizon, in reply, has submitted the sworn affidavit of Ann-Marie E. Kowalczyk, a senior staff consultant for Verizon, wherein she attests that she personally verified that the copies of the interconnection agreement and section 2.6.1 of Tariff No. 8, which were submitted by Verizon, are identical to those on file with the PSC. Ms. Kowalczyk has also submitted copies of the relevant sections of these documents, which she personally made from the PSC's files. Thus, these documents may properly be relied upon by Verizon in support of its motion and the court will consider them in determining the viability of Empire's claims.

### The Claim for Consequential Damages

In support of its motion, Verizon argues that, under the terms of the interconnection agreement and Tariff No. 8,

recovery for its failure to provide properly detailed call records to Empire or to provide support in order to reconcile the defective call records in breach of the terms of Tariff No. 8, must be limited to the $159,622.24 actually paid by Empire for the 15,646,238 call records that were allegedly invalid. Verizon contends that the $2,500,000 in damages that Empire demands for breach of the interconnection agreement based on the "loss of revenue" Empire sustained due to its inability to invoice other carriers and collect the monies owed to it by them, are consequential damages which are barred by section 10.2 of the interconnection agreement entitled "Limitation of Liability," which states:

> "Neither Party shall be liable to the other Party in connection with the provision or use of services offered under this Agreement for indirect, incidental, consequential, reliance, punitive, or like damages, including without limitation, damages for lost profits (collectively 'Consequential Damages'), regardless of the form of action, whether in contract, warranty, strict liability, tort or otherwise, including without limitation, negligence of a Party even if the other Party has been advised of the possibility of such damages; provided that the foregoing shall not limit a Party's obligation under Section 10.1 hereof [which provides for indemnification against claims for damages to tangible personal or real property and/or personal injuries arising out of the negligence or willful act or omission of the indemnifying party]."

Verizon further argues that the recovery of "consequential damages" is likewise barred by Tariff No. 8 § 2.6.1 (E), which similarly provides:

> "The Telephone Company shall not be liable to the CLEC or its customers in connection with the provision or use of services provided under this tariff for indirect, incidental, consequential, reliance, punitive, or like damages, including, without limitation, damages for lost profits, regardless of the form of action, whether in contract, warranty, strict liability, tort or otherwise, including (without limitation) negligence of any kind."

Empire contends that it is entitled to recover lost profits because exculpatory clauses, such as that included in the interconnec-

tion agreement, have been invalidated where there is a special relationship between the parties.[2]

Although a plaintiff generally may seek damages for lost profits which are the foreseeable, natural and probable consequence of a breach of contract, the damages for lost profits sought by Empire in the complaint are within the express limitation of liability of the interconnection agreement and Tariff No. 8 § 2.6.1 (E). "It is well settled that in breach of contract actions 'the nonbreaching party may recover general damages which are the natural and probable consequence of the breach.' Special, or consequential damages, which 'do not so directly flow from the breach,' are also recoverable in limited circumstances" (*Bi-Economy Mkt., Inc. v Harleysville Ins. Co. of N.Y.*, 10 NY3d 187, 192 [2008] [citations omitted]). However,

> "[a] party may not recover damages for lost profits unless they were within the contemplation of the parties at the time the contract was entered into and are capable of measurement with reasonable certainty. . . . The party breaching the contract is liable for those risks foreseen or which should have been foreseen at the time the contract was made" (*Ashland Mgt. v Janien*, 82 NY2d 395, 403 [1993]; *see also Rose Lee Mfg. v Chemical Bank*, 186 AD2d 548, 551 [2d Dept 1992] [holding that plaintiff's claim for "lost profits" was a claim for consequential damages and "such unusual or extraordinary damages must have been brought within the contemplation of the parties as the probable result of a breach at the time of or prior to contracting"]).

Empire's claimed damages for lost revenue were necessarily within the contemplation of the parties at the time the contract was made as evidenced by the exculpatory clause and because billing the originating carriers was the sole reason Empire purchased call records from Verizon. However, section 10.2.2 of the interconnection agreement and section 2.6.1 (E) of Tariff No. 8 both disclaim liability for "indirect, incidental, consequential, [and] reliance" damages including "damages for lost profits." Although plaintiff's claim for lost profits was properly

---

**2.** It is noted that Empire's affirmation in opposition to the motion is unclear as to whether it agrees that "lost profits" are consequential damages. The affirmation includes the headline, "THE COMPLAINT DOES NOT SEEK CONSEQUENTIAL DAMAGES," while arguing that "Verizon and Empire have a special relationship that permits Empire to seek consequential damages."

pleaded, the lost profits damages sought by Empire in the complaint are among the damages expressly excluded in the exculpatory provisions of the interconnection agreement and Tariff No. 8.

However, while contractual provisions limiting damages are generally enforceable, the provisions in the interconnection agreement and Tariff No. 8 would not be enforceable as to Verizon's liability for gross negligence or willful misconduct. "A clear contractual provision limiting damages is enforceable absent a special relationship between the parties, a statutory prohibition, or an overriding public policy" (*Smith-Hoy v AMC Prop. Evaluations, Inc.*, 52 AD3d 809, 810 [2d Dept 2008]; *see also Peluso v Tauscher Cronacher Professional Engrs.*, 270 AD2d 325, 325 [2d Dept 2000]). "It is the public policy of this State, however, that a party may not insulate itself from damages caused by grossly negligent conduct" (*Sommer v Federal Signal Corp.*, 79 NY2d 540, 554 [1992], citing *Kalisch-Jarcho, Inc. v City of New York*, 58 NY2d 377, 384-385 [1983] and *Gross v Sweet*, 49 NY2d 102, 106 [1979]; *see also Smith-Hoy v AMC Prop. Evaluations, Inc.*, 52 AD3d 809, 811 [2008]).

"Gross negligence, when invoked to pierce an agreed-upon limitation of liability in a commercial contract, must 'smack[ ] of intentional wrongdoing' (*Kalisch-Jarcho, Inc. v City of New York*, 58 NY2d, at 385, *supra*). It is conduct that evinces a reckless indifference to the rights of others" (*Sommer*, 79 NY2d at 554; *see also Metropolitan Life Ins. Co. v Noble Lowndes Intl.*, 84 NY2d 430, 438-439 [1994]; *Colnaghi, U.S.A. v Jewelers Protection Servs.*, 81 NY2d 821, 823-824 [1993]; *Matter of New York Tel. Co. v Public Serv. Commn. of State of N.Y.*, 271 AD2d 35, 41 [3d Dept 2000]). Whereas plaintiff has alleged that "Verizon has manipulated the call records by replacing some of the information it receives from other CLECs and wireless carriers with information that renders the call records useless for the purpose they are intended for" (complaint ¶ 25), the complaint sufficiently alleges intentional wrongdoing in reckless disregard of the rights of others so as to state a cause of action, sounding in tort, which would preclude enforcement of the exculpatory provisions of the interconnection agreement and Tariff No. 8.

■ Moreover, although the rights alleged to have been violated by Verizon's acts are those of Empire under the contract, the rights of the public to be afforded competing alternatives in receiving telephone service, as intended by the enactment of the Telecommunications Act of 1996 (*see Global*

*NAPs, Inc. v Verizon New England, Inc.*, 454 F3d 91, 94 [2d Cir 2006]), are also implicated. The statutory structure regulating telephone utilities for the public benefit supports the finding of a special relationship between plaintiff and defendant which would also render the exculpatory clause void as in contravention of public policy. Thus, not only is there alleged a tort claim for gross negligence or willful misconduct sufficient to overcome the application of the exculpatory clause as a matter of public policy, but public policy as reflected in the regulatory structure would also militate against enforcement of the clause relied upon.

Whether a special relationship is created between a CLEC and ILEC that have entered into an interconnection agreement pursuant to the Telecommunications Act of 1996 appears to be an issue of first impression in New York.[3] However, several courts have characterized as "special" the relationship between the public and utilities and common carriers, finding that such special relationship precludes the "enforcement of an exculpatory clause between them against the public interest" (*DeVito v New York Univ. Coll. of Dentistry*, 145 Misc 2d 144, 146 [Sup Ct, NY County 1989]). In *Gross v Sweet* (49 NY2d 102, 106-107 [1979]), the Court of Appeals noted that agreements to exculpate for "willful or grossly negligent acts" are "wholly void," citing the unenforceability of such agreements in the context of a special relationship such as that between a "customer and a public utility under a duty to furnish [reliable] service." In *Broydo v Baxter D. Whitney & Sons, Inc.* (24 Misc 3d 1207[A],

---

**3.** *McLeodUSA Telcom. Servs., Inc. v Qwest Corp.* (469 F Supp 2d 677 [ND Iowa 2007]) appears to be the only published decision specifically addressing whether there is a "special relationship" between exchange carriers that have entered into an interconnection agreement. As here, the dispute involved the allegation that one exchange carrier supplied false information that prevented the other exchange carrier from billing the proper parties and thus prevented their collection of access charges. The court held that, under Iowa law, negligent misrepresentation claims "could co-exist" with breach of contract claims "because the tort of negligent misrepresentation is not based merely on a contractual duty, but is, instead, based on an independent duty arising from the tortfeasor's business or profession of supplying information" and that a special relationship is thereby created which gives rise to a duty of care not generally required in a purely contractual relationship (*McLeodUSA*, 469 F Supp 2d at 691). However, the court ultimately dismissed the negligent misrepresentation claims finding the exchange carrier was not "in the business or profession of supplying information to others" as required by Iowa law and "the alleged provision of misinformation . . . was only incidental to the provision of telecommunication services" (*McLeodUSA*, 469 F Supp 2d at 696-697). The *McLeodUSA* case did not contain a discussion of gross negligence or implicate a contractual exculpatory clause.

2009 NY Slip Op 51295[U] [Sup Ct, Kings County 2009]), the court noted the duty imposed on common carriers because of a special relationship.

While Empire is not itself a "consumer" in the conventional sense, apart from its own commercial purposes, it also serves to further the interests of the private consumer. One of the purposes of the Telecommunications Act of 1996 was "to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies" (*Global*, 454 F3d at 94). Pursuant to the Telecommunications Act of 1996 (47 USC § 252 [i]), Empire adopted a contract previously negotiated between Sprint and Verizon which is, as Verizon described in its motion papers, "word-for-word the same." In fact, the interconnection agreement does not even list Empire as the CLEC in its terms. Rather, Verizon simply provided Empire with a letter agreement dated August 7, 2001 (letter agreement) stating "[Empire] shall be substituted in place of Sprint Communications Company L.P. and Sprint in the Terms wherever appropriate." The letter agreement also states, "[a]s the Terms are being adopted by [Empire] pursuant to [Empire's] statutory rights under section 252 (i), Verizon does not provide the Terms to [Empire] as either a voluntary or negotiated agreement."

Verizon argues that there is no special relationship with Empire as the two sophisticated parties contracted in a commercial setting and, should the court determine that a special relationship exists, it would "overturn[ ] long established precedent[s] that uphold telecommunication contracts' limitation of liability provisions." Empire argues that there is a special relationship between Empire and Verizon because under the regulatory structure for this public utility, Verizon is the only company that can provide the call records to Empire.

"Inequality of bargaining position, where one party 'must either accept what is offered or be deprived of the advantages of the relation', has long been recognized as one of the most important aspects of the type of relationship in which an exculpatory agreement is improper" (*Ash v New York Univ. Dental Ctr.*, 164 AD2d 366, 371 [1st Dept 1990]). In *DeVito v New York Univ. Coll. of Dentistry*, Justice Preminger observed that the threshold consideration in determining whether a special relationship renders enforcement of an exculpation clause contrary to the public interest is whether the business of

the parties is publicly regulated or provides an essential service to the public. In such relationships, "the consumer's need for the service creates an inequality in bargaining strength which enables the purveyor to insist upon a release [of liability], generally on its own prepared form, as a condition to providing the service" (145 Misc 2d at 146).

There was clearly an inequality in bargaining power between the public utilities here as Verizon even acknowledged that the terms of the agreement were not negotiated. Given that the purpose of the Telecommunications Act of 1996 is promoted by Empire's interconnection agreement with Verizon, Empire should be accorded the protection generally due a consumer when dealing with a utility with monopolistic control of the desired service. Verizon is in exclusive control of the network linking the customers of CLECs; Empire either had to accept Verizon's terms of the interconnection agreement or it would not have had access to a necessary component to its participation in the local telephone market. Accordingly, there is a special relationship between Empire and Verizon which renders the exculpatory provisions included in the interconnection agreement and Tariff No. 8 unenforceable as to damages caused by grossly negligent or deliberate conduct (*see Smith-Hoy*, 52 AD3d at 810; *Sommer*, 79 NY2d at 554; *Matter of New York Tel. Co. v Public Serv. Commn. of State of N.Y.*, 271 AD2d 35, 40 [2000]; *Gross*, 49 NY2d at 106).

Empire may only recover lost profits however in the event that a finder of fact determines that Verizon's conduct was grossly negligent or willful as has been alleged. It is well established that a telephone utility company's liability to its customers may be limited to gross negligence or willful misconduct (*see Hamilton Empl. Serv., Inc. v New York Tel. Co.*, 253 NY 468 [1930]; *Columbe v New York Tel. Co.*, 102 AD2d 909 [3d Dept 1984]; *Long Is. Cent. Sta. v New York Tel. Co.*, 54 AD2d 893 [2d Dept 1976]; *American Tel. & Tel. Co. v City of New York*, 83 F3d 549 [2d Cir 1996]; *see also Lauer v New York Tel. Co.*, 231 AD2d 126, 129 [3d Dept 1997] [holding that general limitation of liability provisions, including a limitation applicable in the absence of gross negligence or willful misconduct, "did not preclude plaintiffs' causes of action specifically alleging willful misconduct and gross negligence"]). Moreover, while not raised by the parties herein, this court notes that section 2.6.1 (A) of Verizon's Tariff No. 8 provides:

"No liability shall attach to the Telephone Company

for damages arising from errors, mistakes, omissions, interruptions, or delays of the Telephone Company, its agents, servants or employees, in the course of establishing, furnishing, rearranging, moving, terminating, or changing the service or facilities (including the obtaining or furnishing of information in respect thereof or with respect to the subscribers or users of the service or facilities) in the absence of gross negligence or willful misconduct" (*see* exhibit 8 to defendant's notice of motion).

Thus, the public policy not to permit exculpation for gross negligence or willful misconduct has been expressly incorporated into the tariff and, by reference, into the interconnection agreement.

In *Community Network Serv., Inc. v Verizon N.Y., Inc.* (39 AD3d 300 [1st Dept 2007]), the Appellate Division, First Department, recently allowed a suit similar to the present case to proceed where a plaintiff sought lost profits from Verizon. Plaintiff, like Empire, was "a reseller of telephone services over lines provided by [Verizon]" (at 300). Its complaint alleged that Verizon had billed and been paid for a telephone feature which was not actually provided and, when the plaintiff stopped paying for the feature allegedly not provided, Verizon denied the plaintiff access to its network for nonpayment. The court allowed plaintiff to pursue lost profits as consequential tort damages for gross negligence or willful misconduct specifically holding: "Since there is no dispute that the governing Public Service Commission tariffs limit defendant's liability for service omissions to gross negligence or willful misconduct, and since plaintiff is seeking consequential tort damages in the form of lost profits, the applicable statute of limitations is three years" (*id.* at 301; *see also Columbe v New York Tel. Co.*, 102 AD2d 909 [1984]).

While the Appellate Division, Second Department, has previously upheld a limitation of liability in a tariff that precluded recovery of consequential damages in a case between two telecommunications companies, that decision did not address whether the subject exculpation would be applicable to gross negligence as there was no mention of such issue (*Capital Holdings v NYNEX Mobile Communications Co.*, 264 AD2d 462 [2d Dept 1999], *lv denied* 94 NY2d 755 [1999]). *Capital* is factually distinct from the case at bar as the only claim was for "overcharges" resulting from "dropped" calls which then had to be

redialed. The defendant charged for each call, rounding up to the next minute. The court rejected plaintiff's claim for damages for lost service during the period of disconnection, finding such "consequential damages" to be barred under the tariff. The only claim in *Capital* appears to be based on ordinary negligence.

Appellate courts have affirmed administrative findings of willful misconduct and gross negligence by the Public Service Commission which have led to sanctions, notwithstanding the exculpatory provisions of the applicable tariff. (*See e.g. Matter of New York Tel. Co. v Public Serv. Commn. of State of N.Y.*, 271 AD2d 35, 40 [2000] [holding that the PSC did not apply an improper legal standard in finding willful misconduct and gross negligence where a local exchange carrier concealed its call counting errors and merely estimated call figures]; *see* 1997 NY PSC Op No. 97-7.)

On a motion to dismiss the court must accept the facts alleged in the complaint as true. From the four corners of the complaint, Empire has sufficiently alleged a cause of action for gross negligence (*see 511 W. 232nd Owners Corp. v Jennifer Realty Co.*, 98 NY2d 144, 152 [2002]; *Polonetsky v Better Homes Depot*, 97 NY2d 46, 54 [2001]). While Verizon's duty to Empire is, in the first instance, derived from the interconnection agreement and any recovery for gross negligence in performance may therefore reasonably be said to be subsumed within the breach of contract cause of action, in light of the special relationship created under the statutory regulatory structure, and the public policy reflected therein, defendant's duty to plaintiff also finds an independent basis in that relationship. (*See Sommer v Federal Signal Corp.*, 79 NY2d 540, 550-553 [1992].) Thus, regardless of whether Empire's recovery of lost profits, should it succeed in proving gross negligence, is founded upon the breach of contract cause of action upon the voiding of the exculpatory clause of the contract, or upon the tort claims contained in the complaint, predicated upon a duty created by a special relationship, defendant's motion to excise from the complaint any claim for consequential damages must be denied. In addition, Verizon's motion to dismiss the third cause of action for gross negligence must also be denied.

■ However, Empire's argument that it is entitled to recover lost profits pursuant to Public Service Law § 93 is without merit. Public Service Law § 93 provides that a telephone corporation shall be liable for all losses caused to another corporation if it

"omit[s] to do any act, matter or other thing required to be done, either by law of the state of New York by this chapter or by any order of the commission." Empire argues that Verizon is liable for lost profits resulting from the allegedly invalid caller data as Verizon provides call records to Empire pursuant to Tariff No. 8 and, once a tariff is accepted by the PSC, it takes the force and effect of law. But it has been determined that Public Service Law § 93 applies only to the failure to comply with a "prior determination of the Public Service Commission or a failure to do any act specifically required to be done" (*Meyerson v New York Tel. Co.*, 65 Misc 2d 693, 696 [Sup Ct, Kings County 1971]; *see Van Dussen-Storto Motor Inn v Rochester Tel. Corp.*, 42 AD2d 400, 403 [4th Dept 1973]; *see also Abraham v New York Tel. Co.*, 85 Misc 2d 677, 680 [Civ Ct, NY County 1976]). The statute reinforces the authority of the Public Service Commission to determine the application of tariffs in the first instance. Empire has not alleged that Verizon has violated a prior determination of the PSC nor has it identified a specific direction of the Public Service Law allegedly breached. As noted by Justice Wallach in *Abraham*, "liability imposed by section 93 has been limited to violation of a direct order of prohibition or command issued by the Public Service Commission" (85 Misc 2d at 680). Accordingly, Empire may not seek consequential damages pursuant to Public Service Law § 93 based solely on its allegation that Verizon breached a provision of Tariff No. 8.[4]

The Motion to Dismiss Other Claims

Turning to that branch of Verizon's motion which seeks dismissal of Empire's second, fourth, fifth, sixth, and ninth causes of action for failure to state a claim pursuant to CPLR 3211 (a) (7), it is a well settled rule that in the context of a motion to dismiss pursuant to CPLR 3211, a court must "liberally construe the complaint . . . and accept as true the facts alleged in the complaint and any submissions in opposition to the dis-

---

4. Although Empire initially requested that the PSC provide alternative dispute resolution (ADR) services with respect to the present controversy on December 19, 2008, Empire commenced this action on January 15, 2009 and subsequently withdrew its request for ADR on February 11, 2009. Accordingly, the PSC has not conducted a hearing or reached any determination as to whether the exculpatory provisions in Tariff No. 8 and the interconnection agreement are enforceable in this dispute. Neither party has argued that the PSC has exclusive primary jurisdiction in determining the enforceability of the exculpatory provisions of the interconnection agreement and Tariff No. 8 or that this issue requires the special competence of the PSC (*see Lauer v New York Tel. Co.*, 231 AD2d 126, 129-130 [1997]; *Manhattan Telecom. Corp. v Best Payphones*, 299 AD2d 178 [1st Dept 2002]).

missal motion" (*511 W. 232nd Owners Corp.*, 98 NY2d at 152; *see also Sokoloff v Harriman Estates Dev. Corp.*, 96 NY2d 409, 414 [2001]; *Leon v Martinez*, 84 NY2d 83, 87 [1994]). The court must also "accord [the] plaintiff[ ] the benefit of every possible favorable inference" (*511 W. 232nd Owners Corp.*, 98 NY2d at 152). "The motion must be denied if from the pleadings' four corners 'factual allegations are discerned which taken together manifest any cause of action cognizable at law' " (*511 W. 232nd Owners Corp.*, 98 NY2d at 152, quoting *Polonetsky*, 97 NY2d at 54). On the other hand, if the facts, as alleged in a cause of action, do not fit a cognizable legal theory or are duplicative of another cause of action already asserted in the complaint, that cause of action cannot be maintained (*see generally Leon*, 84 NY2d at 87-88; *Pier 59 Studios L.P. v Chelsea Piers L.P.*, 27 AD3d 217, 218 [1st Dept 2006]).

■ With respect to Empire's second cause of action for tortious interference with business relations, in order to state an actionable claim for tortious interference with business relations, a plaintiff must allege: (1) the existence of a business relation with a third party; (2) that the defendant, having knowledge of such relationship, intentionally interfered with it; (3) that the defendant either acted with the sole purpose of harming the plaintiff or by means that were dishonest, unfair, or improper; and (4) a resulting injury to the plaintiff's business relationship (*see Zdenek Marek v Old Navy [Apparel] Inc.*, 348 F Supp 2d 275, 279-280 [SD NY 2004]; *McQuillan v Kenyon & Kenyon*, 271 AD2d 511, 512 [2d Dept 2000]; *Johnson v Botchman*, 245 AD2d 423, 424 [2d Dept 1997]; *71 Pierrepont Assoc. v 71 Pierrepont Corp.*, 243 AD2d 625, 625-626 [2d Dept 1997]; *M.J. & K. Co. v Matthew Bender & Co.*, 220 AD2d 488, 490 [2d Dept 1995]; *Nassau Diagnostic Imaging & Radiation Oncology Assoc. v Winthrop-University Hosp.*, 197 AD2d 563, 563-564 [2d Dept 1993]). "[C]onduct constituting tortious interference with business relations is, by definition, conduct directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship" (*Carvel Corp. v Noonan*, 3 NY3d 182, 192 [2004]).

Here, Empire does not allege any act by Verizon directed toward the third-party carriers to induce them not to do business with Empire (*see id.*; *Carl v Cohen*, 55 AD3d 478, 479 [1st Dept 2008]; *Havana Cent. NY2 LLC v Lunney's Pub, Inc.*, 49 AD3d 70, 74 [1st Dept 2007]). Empire's second cause of action for tortious interference with business relationship merely alleges that

Empire is unable to invoice carriers for transiting its network due to the invalid and inadequate call records that Verizon sells to it. Empire's inability to bill these third-party carriers, however, would not induce these carriers not to do business with Empire. Thus, Empire's second cause of action fails to state a legally viable claim and must be dismissed (*see* CPLR 3211 [a] [7]).

■ With respect to Empire's fourth cause of action for fraud, in order to plead a cause of action for fraud, a plaintiff must allege that the defendant made a false misrepresentation as to a material fact with the intent to deceive the plaintiff and that such misrepresentation was justifiably relied upon by the plaintiff, causing it to sustain damages (*see Ross v Louise Wise Servs., Inc.*, 8 NY3d 478, 488 [2007]; *New York Univ. v Continental Ins. Co.*, 87 NY2d 308, 318 [1995]; *Channel Master Corp. v Aluminium Ltd. Sales*, 4 NY2d 403, 407 [1958]). Empire's fourth cause of action for fraud alleges that Verizon agreed that it would provide Empire with certain call records at a cost of $0.0102 per record, that Verizon represented that such records could be used to invoice Empire's customers, that Verizon knew that it would provide Empire with invalid and inadequate call records, that Empire relied upon Verizon's representation when it agreed to purchase these call records, and that Empire has been damaged due to its inability to invoice some or all of its clients as a result of the invalid and inadequate call records which it purchased from Verizon.

A cause of action seeking damages for fraud, however, cannot be sustained when the only fraud charged relates to a breach of contract or where the fraud claim is duplicative of a breach of contract claim (*see Ross v DeLorenzo*, 28 AD3d 631, 636 [2d Dept 2006]; *Lee v Matarrese*, 17 AD3d 539, 540 [2d Dept 2005]; *Egan v New York Care Plus Ins. Co.*, 277 AD2d 652, 653 [3d Dept 2000]; *Non-Linear Trading Co. v Braddis Assoc.*, 243 AD2d 107, 118 [1st Dept 1998]; *Alamo Contract Bldrs. v CTF Hotel Co.*, 242 AD2d 643, 644 [2d Dept 1997]; *Weitz v Smith*, 231 AD2d 518, 519 [2d Dept 1996]; *Gordon v Dino De Laurentiis Corp.*, 141 AD2d 435, 436 [1st Dept 1988]). A fraud claim is not sufficiently stated where it merely alleges a misrepresentation of an intention to perform under the contract (*see Makuch v New York Cent. Mut. Fire Ins. Co.*, 12 AD3d 1110, 1111 [4th Dept 2004]; *767 Third Ave. LLC v Greble & Finger, LLP*, 8 AD3d 75, 76 [1st Dept 2004]).

Here, Empire merely alleges that Verizon misrepresented its intention to provide adequate call records, as it had agreed

under the interconnection agreement. Empire does not allege any misrepresentation of a material fact, which was collateral to the contract and served as an inducement for the contract (see *Ross*, 28 AD3d at 636). Consequently, inasmuch as Empire's fourth cause of action for fraud arises out of the identical facts and circumstances as its first cause of action for breach of contract, dismissal of Empire's fourth cause of action for fraud is mandated (see *Ross*, 28 AD3d at 636; *34-35th Corp. v 1-10 Indus. Assoc.*, 2 AD3d 711, 712 [2d Dept 2003]).

■ Empire, in its fifth cause of action for breach of the implied covenant of good faith and fair dealing, also relies upon the same factual allegations as to the inadequacy of the call records which it alleges in its first cause of action for breach of contract, merely adding that Verizon is withholding the benefit of its agreement and is preventing performance of the interconnection agreement. Empire also seeks the same amount of no less than $2,500,000 in damages that it seeks in its breach of contract claim.

"A cause of action to recover damages for breach of the implied covenant of good faith and fair dealing cannot be maintained where the alleged breach is 'intrinsically tied to the damages allegedly resulting' from a breach of the contract'" (*Deer Park Enters., LLC v Ail Sys., Inc.*, 57 AD3d 711, 712 [2d Dept 2008], quoting *Canstar v Jones Constr. Co.*, 212 AD2d 452, 453 [1st Dept 1995]; see also *Cerberus Intl., Ltd. v BancTec, Inc.*, 16 AD3d 126, 127 [1st Dept 2005]; *Hawthorne Group v RRE Ventures*, 7 AD3d 320, 323 [1st Dept 2004]). In this case, inasmuch as the conduct and resulting damages alleged in Empire's fifth cause of action are the same as those alleged in Empire's first cause of action for breach of contract, its fifth cause of action is purely redundant. Therefore, Empire's fifth cause of action must be dismissed as duplicative of Empire's first cause of action for breach of contract (see *Deer Park Enters., LLC*, 57 AD3d at 712; *R.I. Is. House, LLC v North Town Phase II Houses, Inc.*, 51 AD3d 890, 896 [2d Dept 2008]; *Pier 59 Studios*, 27 AD3d at 218; *Canstar*, 212 AD2d at 453).

■ As to Empire's sixth cause of action for negligent misrepresentation, it is well established that "[a] claim for negligent misrepresentation requires the plaintiff to demonstrate (1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information" (*J.A.O. Acquisition Corp. v*

*Stavitsky*, 8 NY3d 144, 148 [2007]). "To establish liability for negligent misrepresentation arising out of a commercial transaction, a party must demonstrate that the person making the misrepresentation possessed specialized or unique experience, or the persons involved are in a special relationship of confidence and trust such that reliance on the negligent misrepresentation is justified" (*Salesian Socy. v Nutmeg Partners*, 271 AD2d 671, 673 [2d Dept 2000]; *see Fresh Direct v Blue Martini Software*, 7 AD3d 487, 489 [2d Dept 2004]). "Whether the nature and caliber of the relationship between the parties is such that the injured party's reliance on a negligent misrepresentation is justified generally involves a question of fact" (*Salesian Socy.*, 271 AD2d at 673; *see Kimmell v Schaefer*, 89 NY2d 257, 264 [1996]).

Here, Empire has sufficiently pleaded the elements of negligent misrepresentation as the complaint alleges that Verizon provided incorrect caller data, Empire necessarily relied on that data for the purposes of billing its customers, and, as this court has found, there is a special relationship between Empire and Verizon as Verizon is alleged to be the only entity that can provide such caller data pursuant to the regulatory scheme. However, as to ordinary negligence, the provisions of the interconnection agreement, Tariff No. 8 and case law (*see Hamilton*, 253 NY at 471; *Long Is. Cent. Sta.*, 54 AD2d at 893) establish that Verizon may not be held liable to Empire. Accordingly, Verizon's motion to dismiss the sixth cause of action for negligent misrepresentation must be granted.

■ With respect to Empire's ninth cause of action for prima facie tort, "[p]rima facie tort was designed to provide a remedy for intentional and malicious actions that cause harm and for which no traditional tort provides a remedy, and not to provide a catchall alternative for every cause of action which is not independently viable" (*Epifani v Johnson*, 65 AD3d 224, 232 [2d Dept 2009]; *see also Etzion v Etzion*, 62 AD3d 646, 651-652 [2d Dept 2009]; *Lancaster v Town of E. Hampton*, 54 AD3d 906, 908 [2d Dept 2008]; *Bassim v Hassett*, 184 AD2d 908, 910 [3d Dept 1992]). The elements necessary to plead a claim of prima facie tort are "(1) the intentional infliction of harm, (2) which results in special damages, (3) without any excuse or justification, (4) by an act or series of acts which would otherwise be lawful" (*Freihofer v Hearst Corp.*, 65 NY2d 135, 142-143 [1985]; *see also Curiano v Suozzi*, 63 NY2d 113, 117 [1984]; *Burns Jackson Miller Summit & Spitzer v Lindner*, 59 NY2d 314, 332 [1983]). Moreover, in order to make out a claim sounding in prima facie

tort, the plaintiff must "allege that disinterested malevolence was the sole motivation for the conduct of which [it] complain[s]" (*R.I. Is. House, LLC*, 51 AD3d at 896; *see Epifani*, 65 AD3d at 232).

Empire's ninth cause of action for prima facie tort alleges that Verizon has intentionally manipulated the call records so that long distance calls appear as local calls, and that Verizon has done so without excuse or justification and with the intention to maliciously harm it. Empire seeks damages based on this claim of no less than $1,000,000. However, while Empire alleges that Verizon intentionally inflicted harm upon it without excuse or justification, it has failed to plead that Verizon's actions were motivated solely by disinterested malevolence (*see White v Ivy*, 63 AD3d 1236, 1239 [3d Dept 2009]; *see Epifani*, 65 AD3d at 232; *Lancaster*, 54 AD3d at 908; *R.I. Is. House, LLC*, 51 AD3d at 896). Moreover, plaintiff's accusations are logically explained by defendant's self-interest in depriving plaintiff of a business opportunity in the hope that defendant's competition may be diminished. Consequently, Empire has not pleaded a viable cause of action for prima facie tort, and dismissal of Empire's ninth cause of action is mandated (*see* CPLR 3211 [a] [7]). It is further noted that plaintiff may obtain full relief under other causes of action and is not without a remedy.

Accordingly, defendant's motion is granted insofar as it seeks dismissal of the second, fourth, fifth, sixth and ninth causes of action and is denied insofar as it seeks dismissal of the third cause of action. Defendant's motion to dismiss plaintiff's claims for consequential damages for lost profits is denied to the extent that plaintiff may recover lost profit damages if there is a finding of gross negligence or willful misconduct.